In re David L. BOSSINGHAM, Debtor.

David L. BOSSINGHAM, Appellant,

v.

BLOOMINGTON PRODUCTION CRED-
IT ASSOCIATION, et al., Appellees.

Civ. Nos. 84–431–E, Civ. 84–432–E.
Bankruptcy No. 81–2382–C.

United States District Court,
S.D. Iowa, C.D.

April 22, 1985.

Donald F. Neiman, Des Moines, Iowa, for debtor.

T. James McDonough, Des Moines, Iowa, Myron L. Gookin, Fairfield, Iowa, for creditors.

## ORDER

### DONALD E. O'BRIEN, Chief Judge.

This controversy between creditors of David L. Bossingham over their respective rights in his 1984 crop has come before the Court in a rather unique manner. The issues presently submitted to this Court involve whether Joanne C. Bossingham has a valid perfected security interest in the 1984 crop and, if so, whether that security interest has priority over the perfected security interest of the Bloomington Production Credit Association (BPCA). For the reasons stated below, the Court holds that Joanne Bossingham does have a valid perfected security interest which takes priority in the 1984 crop.

A number of hearings have been held before this Court since June 15, 1984; during most of these hearings, the matter of Mrs. Bossingham's security interest was mentioned. At the hearing held on February 13, 1985, in Des Moines, Iowa, Mrs. Bossingham took the witness stand and testified about the action she and her husband had taken with reference to financing the 1984 crop. In view of the record before the Court, sufficient evidence exists to make the necessary findings of fact. Many of the findings the Court will make are not particularly controversial; the most hotly contested issues are questions of law involving Article 9 of the U.C.C.

## FINDINGS OF FACT

1. Joanne C. Bossingham, the wife of David L. Bossingham and a resident of the State of Iowa, lives in Lockridge, Jefferson County, Iowa.

2. BPCA is a corporation organized and existing under the laws of the State of Illinois and is authorized to do business in the State of Iowa.

3. On April 13, 1981, Debtor David L. Bossingham executed a promissory note to BPCA in the amount of $625,685.00. To secure this loan, BPCA took a security interest in collateral which included, among other things, corn and soybean crops "which are now or will during the term of this Security Agreement become growing." This security interest was perfected by the filing of a financial statement with Iowa's Secretary of State on April 16, 1981. The loan and accrued interest became due and payable January 1, 1982.

4. David Bossingham's Chapter 11 petition filed December 30, 1981 was dismissed over his objections by the Bankruptcy Court on May 10, 1984. This Court affirmed that dismissal by the Bankruptcy Court on February 5, 1985. 46 B.R. 725.

5. In dismissing Debtor's Chapter 11 petition, the Bankruptcy Court found that he had no cash on hand and would be unable to finance the 1984 crop unless a plan was confirmed. Although no plan was confirmed and his bankruptcy case was dismissed, David L. Bossingham was able to plant a crop in 1984 as a result of the financial assistance of his wife, Joanne Bossingham.

6. On May 17, 1984, Joanne Bossingham filed a financing statement with Iowa's Secretary of State. Plaintiff's Exhibit 2, 2A from February 13, 1985 hearing. On May 24, 1984, Joanne Bossingham filed a financing statement with Illinois's Secretary of State. Plaintiff's Exhibit 3. These financing statements contain the signature of the Debtor, a description of the collateral—"all of Debtor's crops now growing for 1984" and "1984 crops" respectively—and the names and mailing addresses of the Debtor and the secured party.

7. Joanne Bossingham and David Bossingham entered a handwritten agreement which is page 4 of Exhibit 2A. This agreement is also attached as Exhibit F to BPCA's Brief filed February 13, 1984. The agreement is entitled "1984 Agreement Between Joanne B. and David Bossingham" and reads:

Joanne B. is providing cash inputs as well as credit inputs due to her credit worthiness and I, David Bossingham,

agree to reimburse and pay to Joanne B. all expenses incurred by her on my behalf in the 1984 crop year.

It is also my wish, in the event of my death that these wishes and desires be carried out with interest, to be paid for Joanne's cash inputs at the rate of 14% interest.

/s/ David L. Bossingham

This agreement was not dated but, based on the testimony of Joanne Bossingham and the cross-examination of her by BPCA which included the use of her deposition, the Court finds that this specific agreement had not been entered at the time the financing statement was filed in Iowa. It was entered shortly after that date. The Court finds this written agreement was in existence by at least May 26, 1984 and maybe sooner. For the purposes of this Order, the Court will consider the agreement as having been entered on May 26, 1984. The Court further finds that at the time this agreement was entered, the parties actually intended to create a security interest in favor of Joanne Bossingham.

8. On October 30, 1984, Joanne Bossingham and David Bossingham amended their agreement of May 26, 1984. They drafted this amendment out of caution to cure formal deficiencies, if any, in the previous documents which would prevent Mrs. Bossingham from having a valid security interest in the 1984 crop. This amendment is another expression of their actual intent to create a first lien for Mrs. Bossingham in the 1984 crop. This amendment is page 3 of Plaintiff's Exhibit 2A and also the third page of Plaintiff's Exhibit 3.

9. In view of the finding by the Bankruptcy Court that no financing was available for 1984 and the deterioration of the relationship between BPCA and the Debtor, it is reasonable to infer that the Debtor would not have been able to plant and raise a crop in 1984 if it had not been for the financial assistance of Joanne Bossingham. The fact that she tried to secure her loan with the Debtor's 1984 crop does not give rise to an inference of bad faith on her part or of collusion with the Debtor to defraud other creditors. Other creditors would not have had a 1984 crop to look to had she not been willing to finance such production. No reasonable creditor would have advanced sums for 1984 production costs to a person in David Bossingham's situation without taking the resulting crop as security.

Furthermore, the October 30, 1984 document, which contains a description of itself as an amendment to the prior security agreement of Joanne Bossingham and the Debtor, is not the product of collusion between the parties to that agreement to defraud other creditors of the Debtor. Mrs. Bossingham is not a sophisticated lender. As previously found, the October 30, 1984 document was the product of caution designed to cure formal deficiencies, if any. Next, the BPCA was aware of her claimed security interest in the crop. Although evidence has not been presented to show the exact time BPCA knew of this claim, neither has BPCA shown that it was taken advantage of and then harmed due to the existence of a "secret lien." Theoretically, BPCA was put on notice of the possibility of such a lien when Mrs. Bossingham filed the financing statements and it would have been imprudent for BPCA to change its position in reliance on the 1984 crop without making an inquiry to Mrs. Bossingham about the existence and extent of her lien.

10. With regard to the September 1983 agreement between BPCA and David L. Bossingham, the evidence shows that the Debtor has not performed the conditions and requirements of that agreement. After this failure, the BPCA did not continue to abide by the agreement and was justified in so doing.

## CONCLUSIONS OF LAW

I.C.A. § 554.9203(1) sets forth the requirements for the creation of a security interest. First, the Debtor must sign a "security agreement" which describes the collateral and, when the collateral is crops growing or to be grown, describes the land concerned. Second, value must be given

by the creditor. Third, the debtor must have rights in the collateral. If these three things have happened, a security interest "attaches" to the collateral.

### I. The Valid Security Agreement.

The first major dispute is whether Mrs. Bossingham entered a "security agreement" with the Debtor. "Security agreement" is defined as "an agreement which creates or provides for a security interest." I.C.A. § 554.9105(1)(*l*). A two-step inquiry confronts the Court when addressing the written security requirement.

> The *court* must first resolve, *as a question of law*, whether the language embodied in the writing objectively indicates that the parties have intended to create or provide for a security interest. If the language crosses this objective threshold, that is, if the *writing* evidences a possible secured transaction and thus satisfies the statute of frauds requirement, then the *factfinder* must inquire whether the parties actually intended to create a security interest.

J. White & R. Summers, *Uniform Commercial Code* 905 (2d ed. 1980).

In applying the objective, legal test, this Court judicially "estimates"[1] that Iowa would adopt the view of Professor White and Professor Summers that:

> [d]espite the virtue of specificity, we believe that courts should generally be lenient in upholding writings, signatures, and descriptions under 9–203 (and its earlier counterparts) against third party attack. * * *
>
> The possibilities of debtor-creditor collusion and secured creditor fraud or fudging (as to covered collateral) may seem more serious objections to a liberal approach to 9–203. Yet we advocate that approach. First, *some* writing is always required, and this diminishes scope for collusion or fabrication; parol evidence is not admissible to supplant written terms. Second, not all situations pose collusion or fraud risks. Finally, we suspect that in evaluating purported security agree-

ments under liberal tests, courts and juries will usually be able to differentiate fabricated from genuine claims anyway. *Id.*, at 904.

### A. Financing Statement Alone.

■ Mrs. Bossingham first argues that the financing statement she filed is sufficient to double as a security agreement. The critical question is whether the language used in the financing statement objectively shows an agreement by the debtor to grant the creditor rights in the collateral. The financing statements filed in Iowa and Illinois are standard forms which have been approved by the respective Secretaries of State. This Court is unable to find language in those forms which objectively indicates the Bossinghams intended to create a security interest. Thus, *Kaiser Aluminum & Chemical Sales, Inc. v. Hurst*, 176 N.W.2d 166 (Iowa 1970), cannot be distinguished and, accordingly, the financing statement fails to qualify as a security agreement.

### B. Handwritten Agreement.

■ Next, Mrs. Bossingham argues that the handwritten agreement of May 26, 1984 and the financing statements, when viewed collectively, satisfy the requirements for a security agreement. First, the Court judicially "estimates" that Iowa would hold that:

> Although a standard form financing statement by itself cannot be considered a security agreement, an adequate agreement can be found when a financing statement is considered together with other documents.

*In re Numeric*, 485 F.2d 1328, 1332 (1st Cir.1973). The Court holds that the financing statement and May 26, 1984 agreement, when read together, satisfy the objective test with respect to showing an intention of the parties to create a security interest. In so holding, the Court has considered the factors set out in J. White & R. Summers, *Uniform Commercial Code* 909 (2d ed.

---

1. *See Heeney v. Miner*, 421 F.2d 434, 439 (8th Cir.1970).

1980). Further, the Court adheres to the view that specific "words of grant" are not required. *Id.*, at 907.

■ With respect to the second step, the Court has previously found that the Bossinghams actually intended to create a security interest as a result of their transactions in May of 1984. Accordingly, the Court concludes that Mrs. Bossingham has satisfied the written "security agreement" requirement of U.C.C. §§ 9–203 and 9–105.

■ The main policies underlying the written agreement requirement are statute of fraud concerns and protection of third party debtors. This holding does not offend the policies underlying the written agreement requirement. *See* I.C.A. § 554.-1102(1). First, the statute of fraud purpose is satisfied because the secured party and the debtor are not in dispute over the existence or scope of the security interest. Second, the goal of protecting third-party creditors, alternatively described as the prevention of debtor-creditor collusion and secured creditor fraud or fudging,[2] is satisfied. Collusion is not a concern here because the evidence does not show that any third-party creditor extended credit to the debtor in reliance on the 1984 crop or that such a creditor examined the documents and then acted to his detriment. Indeed, the evidence shows that there would be no 1984 crop over which to fight had it not been for the financial assistance of Mrs. Bossingham. Although the interest accruing on the debt owed to the BPCA could be looked upon as an extension of credit, the BPCA has made diligent efforts to enforce its security rights in the collateral and, as a result, the accrual of interest was not caused by the BPCA foregoing rights in certain collateral in reliance on the 1984 crop. Also, the BPCA took possession of Debtor's machinery but kept it close to his residence. This was done pending the outcome of Debtor's request for a stay and appeal of the bankruptcy dismissal. It was not done in reliance on the 1984 crop.

**2.** This goal is primarily served by the description of collateral requirement and, under the facts of this case, the fact that Mrs. Bossingham

### C. October 30, 1984 Amendment.

■ This document clearly refers to the agreement which it seeks to amend as a "security agreement." It also contains the word "collateral." When these "magic words" are present in a writing, the legal question is not even close. Under the objective test to be applied to the writings to determine if the parties intended to create a security interest, this document, even standing alone, easily passes the written agreement requirement of U.C.C. §§ 9–203 and 9–105.

### II. Remaining § 9–203 Requirements.

David L. Bossingham signed both the May agreement and the October amendment. Sections 9–203(1)(a); 1–201(39).

The May agreement and the financing statement, when read together, describe the collateral as the 1984 crops of corn and soybeans and describe the land on which it was grown. The October amendment describes the collateral as corn and soybeans growing on certain described land. § 9–203(1)(a).

■ It appears that Mrs. Bossingham financed the crop in two ways, by lending money to the Debtor who would in turn buy the inputs or by purchasing the inputs herself. The May Agreement contemplates her providing financial backing as it is needed through the growing season. The parties shall attempt to resolve the specifics of her loans and/or expenditures on the 1984 crop. Thus, the Court concludes that Mrs. Bossingham has given value to the Debtor. §§ 9–203(1)(b); 1–201(44). The extent of the value given shall be worked out by the parties.

■ At a minimum, when the crops were planted, the Debtor had possessory rights to those crops and thereby satisfies the "rights in the collateral" requirement of § 9–203(1)(c).

will be required to prove the extent of her inputs.

*Conclusion.* Mrs. Bossingham had a valid and enforcible security interest which attached to the 1984 crop on May 26, 1984. Alternatively, Mrs. Bossingham had a valid and enforcible security interest which attached to the 1984 crop on October 30, 1984.

### III. Priority.

■ The battle between the perfected security interest of Mrs. Bossingham and BPCA is controlled by § 554.9312(2) which provides in full:

A perfected security interest in crops for new value given to enable the debtor to produce the crops during the production season and given not more than three months before the crops become growing crops by planting or otherwise takes priority over an earlier perfected security interest to the extent that such earlier interest secures obligations due more than six months before the crops became growing crops by planting or otherwise, even though the person giving new value had knowledge of the earlier security interest.

As discussed above, Mrs. Bossingham's security interest in the 1984 crop attached on May 26, 1984 when the Agreement was entered. Alternatively, it attached when the October 30, 1984 document was entered. Her security interest was perfected due to the fact that she had filed a financing statement before the Agreements were entered. Consequently, it is clear that she had a "perfected security interest in the crops."

Next, this perfected security interest was "for new value given to enable the debtor to produce crops during the production season." The term "new value" is illustrated in comment 2 to U.C.C. § 9–108 as "making an advance" and "incurring an obligation." It appears Mrs. Bossingham did both of these things in financing the production of the 1984 crop. As previously found, this financial backing made it possible for the Debtor to grow and raise the 1984 crop during the 1984 growing season.

The Court interprets the phrase "given not more than three months before the crops became growing crops by planting" as modifying the term "new value" and not as modifying "perfected security interest." On the record presently before the Court, the Court is unable to determine when the crops at issue were planted. The Court will leave this factual determination to the parties to be worked out when they are going through Mrs. Bossingham's records. If the parties are able to agree on a date, they should use a date three months prior to the agreed-upon planting date as a cut-off for new value given which is secured by the 1984 crop. In other words, money advanced or obligations incurred by Mrs. Bossingham over three months before the planting date are not secured debt which has priority under § 9–312(2).

The facts indicate that Mrs. Bossingham did not give one lump-sum loan to the debtor prior to the start of the planting season; rather, it appears that she provided financing throughout the year as it was needed. Thus, the question arises, which obligations are within the scope of the security interest and, of those obligations, which are to be given priority under § 9–312(2)? Iowa appellate courts have yet to rule on this issue. BPCA could argue that the term "new value" must be defined with reference to when the security agreement came into existence. In other words, debt incurred by Mrs. Bossingham before the Agreement would be considered "old" value if the point of reference is the creation of the security agreement. On the other hand, Mrs. Bossingham could argue that "new" must be defined from the perspective of the collateral securing the "new value given." By analogy, she could argue this interpretation is consistent with the ideas underlying the priority preference given to purchase money security interests. Value which she gave to the debtor for the purpose of producing a 1984 crop would fit in this definition of "new value" since it was the value which made the 1984 crop possible.

The Court judicially estimates that Iowa would interpret this U.C.C. provision in a

manner to maximize the protection given to the creditor who is actually financing the production of the 1984 crop. As observed in J. White & R. Summers, *Uniform Commercial Code* 1052–53 (2d ed. 1980), the priority rules under § 9–312(2) are confusing and not certain. This Court's interpretation does not offend the words chosen in § 9–312(2) nor the policy of protecting secured parties with a legitimate expectation to certain collateral. The Court is unable to discern how BPCA is harmed by giving priority to that portion of Mrs. Bossingham's debt incurred no more than three months prior to planting and which enabled the production of the 1984 crop when compared to the position the BPCA would be in if David Bossingham had been unable to raise a 1984 crop at all. Finally, BPCA's perfected security interest secured an obligation due January 1, 1982, a point in time well before the date six months prior to the planting of the 1984 crop.

■ *Conclusion.* Mrs. Bossingham has a perfected security interest in the 1984 crop which takes priority over BPCA's perfected security interest to the extent of the funds advanced and obligations incurred by Mrs. Bossingham during the period from the date three months prior to the planting of the 1984 crop until the 1984 crop was harvested and delivered. These funds or obligations must have been given to enable the Debtor to produce and harvest the 1984 crop. BPCA's security interest in the 1984 crop shall have second priority behind the security interest of Mrs. Bossingham.

### Additional Matter.

■ 1. *September 1983 Agreement.* The law is well established that a party to a contract who does not perform his side of the bargain may not enforce the terms of that contract against the other contracting party. Since David Bossingham did not perform as required by the September 1983 Agreement he had with BPCA, he cannot rely on that agreement to prevent BPCA from claiming an interest in the 1984 crop.

2. *Harvest of 1984 Crop.* It has come to the attention of the Court through an April 15, 1985 letter from David L. Bossingham that the 1984 harvest was finished as of April 5, 1984. The letter indicates that the crop had to be custom harvested and that an amount of $1,335.00 is owed to Dave Hollingsworth, Rural Route, Packwood, Iowa 52580, for this work. In addition, the letter states that "[g]etting the crops out should sum things up."

The Court agrees with this quoted statement to the extent that while the farming end of the case may be summed up, the case is in a position to get moving again from the lawyers' point of view. A number of matters must be resolved before this Court can close out its file on this case.

3. *Extent of Mrs. Bossingham's Security Interest.* First, BPCA and Joanne Bossingham must meet and see if they can work out an agreement as to what expenditures made by Mrs. Bossingham are within the scope of her perfected security interest. If they cannot agree on everything or work out a compromise on the items on which they cannot agree, they shall frame the issue or issues on which they cannot agree and then the Court will take the steps necessary to decide those issues.

4. *Accounting of 1984 Crop.* Second, David L. Bossingham must give a FULL AND COMPLETE FINAL ACCOUNTING of the 1984 crop of corn and soybeans. In this Court's Order filed November 1, 1984, in which the Debtor was allowed to conduct the harvest of the 1984 crop, the Court stated:

2. The parties may agree to sell all or any portion of the grain harvested. If they so agree, the cash generated shall be placed in an interest-bearing trust account. The grain which the parties cannot agree to sell shall be stored in a disinterested elevator and the parties shall obtain warehouse receipts for all stored grain. The Court recognizes the parties disagree over whether certain crops are covered by the Bloomington PCA's security interest. The crops which are sub-

ject to this dispute shall be handled in the same manner as set forth above.

Now that Bossingham has represented to the Court that the harvest is finished, it is now appropriate for a final accounting to be made by him which states (1) how many bushels of corn and how many bushels of soybeans were harvested from what has previously been referred to as "unliened ground," (2) how many bushels of corn and how many bushels of soybeans were harvested from "liened ground," (3) what happened to these bushels of grain (For example, if they were sold, he should state where they were sold and for how much. If they were stored, he should state where they were stored and how much was stored at that location.), and (4) if the grain was sold, where the grain was sold, how much was sold, for what price and precisely where is the money received from the sale.

5. *Contempt.* At the hearing on February 13, 1985, the Court stated its concerns with regard to why it had not entered a show cause order to the Debtor, David Bossingham. At this point in time the Court believes the best procedure would be for this case to proceed with the determination of the extent of Mrs. Bossingham's security interest and with the accounting from David L. Bossingham before any further steps are taken with regard to the application for contempt. It may be that a clear and full accounting by David Bossingham will satisfactorily resolve the questions raised by the BPCA in its application and, if such is the case, there would be no need to proceed any further with the contempt matter.

6. *Legal Representation of David Bossingham.* In his letter dated April 15, 1985, David Bossingham states:

I do not believe that counsel, Mr. Don Nieman can have my best interests at heart, since he does also represent P.C. A.'s and F.L.B.'s. I do not know if you are aware or not that my wife also filed a motion to the Court for a judgment on the pleadings on her Petition of Intervention, which was to be answered within seven days and to this day is in default and has not even been mentioned by P.C.A. or F.L.B.

\* \* \* \* \* \*

I am planning on representing myself in court from now on and would like it verified by the court.

The motion for judgment on the pleadings referred to was filed on November 28, 1984 in the Iowa District Court for Jefferson County in the case of *The Federal Land Bank of Omaha v. David L. Bossingham, et al.,* Equity No. CE875.

First, the letter does not mention whether or not Joanne Bossingham intends to proceed with her present counsel. In view of this Court's ruling regarding her security interest, it appears to the Court that she would benefit from continued legal representation in this case because the parties must get together and determine the extent of her security interest. Thus, at this point, the Court assumes she will continue to be represented by her present counsel of record.

Second, the Court cannot "verify" that Mr. Bossingham is now representing himself. The Court believes that his attorney has acted in the best interest of Mr. Bossingham and will continue in this belief until evidence is presented to the Court showing otherwise. Furthermore, counsel has not filed a motion to withdraw as counsel for either Mr. or Mrs. Bossingham. It would not be appropriate for the Court to dismiss an attorney from this case without any properly filed pleadings or motions and without any evidence or affidavits before the Court.

7. *Proceeds at Packwood Elevator.* On February 13, 1985, Dale Sullivan, the owner and manager of the Packwood Elevator, testified about a transaction involving the sale of grain to Cargill at Gibson City. This grain was produced in 1984 on land farmed by David Bossingham. Mr. Sullivan further testified that some proceeds from this sale are still under the control of the elevator because he did not know who to pay. The Court is considering directing Mrs. Bossingham to receive

these proceeds from the Packwood Elevator and deposit them in an interest bearing bank account in her name only. Then the funds would be drawing interest while the attorneys for the parties are working out the extent of her security interest. The Court requests input from the parties on how these proceeds should be handled pending final judgment in this case.

8. *Final Order.* The Court intends to retain jurisdiction over this case to complete the matters set forth above. The Court further intends that the legal rulings made in this order are not appealable now, but can be challenged by appeal after a judgment has been entered. In other words, if any party feels that the Court erred in the rulings made in this decision, that party need not worry about waiving its right to appeal by proceeding with the unfinished matters instead of appealing this order.

IT IS THEREFORE ORDERED that the lawyers for BPCA and Joanne Bossingham are directed to get together and work on agreeing to the amount of Joanne Bossingham's security agreement consistent with the rulings of this Court set forth above. The attorneys shall report their progress to the Court on or before May 3, 1985.

IT IS FURTHER ORDERED counsel for David Bossingham and David Bossingham are directed to talk to one another about the continued legal representation of David Bossingham by that attorney. After this discussion, counsel and/or David Bossingham are directed to write a letter to the Court informing the Court about the status of their relationship. The letter(s) shall be sent to the Court no later than April 26, 1985. After receiving the letter(s), the Court will request input from the parties on the procedure that should be adopted for the accounting and whether or not a hearing or conference before the Court would be appropriate or helpful.

IT IS FURTHER ORDERED that counsel for Joanne Bossingham and BPCA shall report to the Court any objections to the procedure set forth above or suggestions regarding the treatment of the grain proceeds held by the Packwood Elevator on or before April 26, 1985.

IT IS FURTHER ORDERED that the Court will set this matter down for a hearing at the next available date. Given the Court's schedule, the parties may not get notice much in advance of the hearing, so they are directed to begin expeditiously working on the matters set forth in this Order so that they will be ready for the hearing when it is scheduled.

IT IS FURTHER ORDERED that this Order is not an order from which an appeal lies. *See* Fed.R.Civ.P. 54(a). The Court retains jurisdiction for further proceedings consistent with this opinion.

IT IS FURTHER ORDERED that the Clerk of this Court is directed to send a copy of this Order to David Bossingham, R.R. 1, Lockridge, Iowa 52635.