**In re Jimmy Doyle HARDAGE and wife, Danelle Hardage, Debtors.**

**Bankruptcy No. 587–50841–7.**

United States Bankruptcy Court,
N.D. Texas,
Lubbock Division.

May 15, 1989.

Deborah J. Penner, Hankins & Penner, Lubbock, Tex., for debtors.

Dan G. Young, McCleskey, Harriger, Brazill & Graf, Lubbock, Tex., for Sears.

MEMORANDUM OF OPINION ON VALIDITY OF SEARS DOCUMENTS AS A SECURITY INTEREST

JOHN C. AKARD, Bankruptcy Judge.

The issue before the Court is: Do the sales slips denominated "credit billing

copy," of Sears, Roebuck & Co. (Sears), constitute valid security agreements such that pursuant to Uniform Commercial Code (U.C.C.) Article 9 Sears has perfected security interests in the consumer goods sold? [1]

## Facts

The Debtors in this Chapter 7 proceeding, Jimmy Doyle Hardage and Danelle Hardage, are typical of the many financially overextended consumer debtors who appear before this Court to request relief. On June 14, 1986, and on November 8, 1987, the Debtors purchased a videocassette recorder for $315.36 and a guitar board for $181.89, respectively, from Sears by using their charge card. Mr. Hardage signed the sales slips at the time of purchase.

Thirty-nine days after the purchase of the guitar board, on December 17, 1987, the Debtors filed for relief under Chapter 7 of the Bankruptcy Code.[2] Debtors listed Sears as an unsecured creditor without priority, disclosing a claim in the amount of $1,453.07. On February 19, 1988, notice of Debtors' Petition in Bankruptcy was mailed to all parties in interest, stating that no proofs of claims need be filed at that time as this was a no-asset case. On March 12, 1988, the Debtors filed a reaffirmation agreement, agreeing to pay Sears the amount of $402.64, but this reaffirmation agreement stated on its face that it may be rescinded at any time prior to discharge or within 60 days after the agreement is filed with the Court. On June 29, 1988, the Debtors filed a Motion to Deem this debt unsecured. This Motion stated that Sears had filed a proof of claim in the amount of $1,496.33, claiming a security interest in the goods for the sum of $402.64 based on the sales slips Mr. Hardage had signed, as well as an unsecured claim in the amount of $1,093.69. The motion further stated that Sears had provided no evidence of an executed agreement by Debtors granting Sears a security interest. In an answer to the Debtors' motion, filed on July 8, 1988, Sears admitted that it had filed a Proof of Claim in the sum of $1,496.33, but denied that it had not provided any evidence of an executed security agreement which would grant it a security interest. Sears' answer prayed that the Court determine that its security interest was valid as evidenced by the sales slips signed by Mr. Hardage.

The sales slips at issue contain, among other things, the following information:

1. The Debtors' credit account number;
2. Mr. Hardage's name;
3. The date of purchase;
4. The amount of purchase;
5. A brief description of the goods sold;
6. An invoice number;
7. One sales slip contains the Debtors' address; the other does not;
8. Mr. Hardage's signature appears on both sales slips immediately below the legend:

> This purchase is subject to the approval of the Sears Credit Sales Department and is made under my SearsCharge Account Security Agreement for my SearsCharge Modernizing Credit Plan Security Agreement which is incorporated herein by reference. I agree that Sears retains a security interest under the Uniform Commercial Code in the merchandise purchased until fully paid.

No SearsCharge Account Security Agreement or SearsCharge Modernizing Credit Plan Security Agreement were introduced, so a security agreement, if one exists, must be found in the last sentence of the quoted provisions of the sales slip. No evidence was introduced as to the terms of payment or remedies available to Sears upon default, as would be normally contained in a security agreement, nor was evidence introduced as to the definition or occurrence of default. At hearing, the Debtors alleged that the Sears sales slips

---

1. The Court heard testimony on the Debtors' Motion to Deem Debt Unsecured on August 31, 1988. The parties filed written stipulations as well as briefs.

2. The Bankruptcy Code is 11 U.S.C. § 101 *et seq.* References to section numbers are to sections in the Bankruptcy Code.

do not constitute sufficient evidence of an agreement executed by Debtors granting Sears a security interest in the consumer goods they purchased. Sears insisted that the documents in question granted it a valid security interest in the goods it sold.

## Discussion

The Texas version of the U.C.C. sets forth the formal requisites a party must follow to create an Article 9 security interest enforceable against the buyer or third parties with respect to the collateral. In pertinent part, these steps are: 1) the debtor signs a security agreement which contains a description of the collateral; 2) value has been given; and 3) the debtor has rights in the collateral. Tex.Bus. & Com. Code Ann. § 9.203(a) (Vernon Supp.1989). A financing statement is not necessary to perfect a purchase money security interest in consumer goods. *Id.* at § 9.302(a)(4).

The writing requirement may be simply expressed as follows; it must: 1) contain sufficient language to embody a "security agreement"; 2) include an adequate description of the collateral; and 3) be signed by the debtor. J. White and R. Summers, 2 *Uniform Commercial Code* § 24–3 at 297 (West 3d. ed. 1988) (hereinafter *White & Summers*). Since items 2 and 3 are not in dispute, we turn to item one, the sufficiency of the language to embody a security agreement.

Section 9.105(a)(12) states a security agreement means "an agreement which creates or provides for a security interest." Tex.Bus. & Com.Code Ann. § 9.105(a)(12) (Vernon Supp.1989). Where the parties are in dispute on this issue, the court may have to resolve first, as a question of law, whether the language in the agreement objectively indicates the parties may have intended to create or provide for a security interest. *White & Summers, supra* at 299. *See, e.g., In re Bossingham,* 49 B.R. 345 (Bankr.S.D.Iowa 1985) *aff'd,* 794 F.2d 681 (8th Cir.1986) (opining where the "magic words" of "security agreement" and "collateral" are present, "the legal question is not even close" under the objective test of intent to create a security interest. *Id.* at 350).

Although some courts read "may have intended" to require more, other courts rely on Comment 5 to § 9.203, which states that the writing requirement is more in the nature of satisfaction of the statute of frauds. *White & Summers, supra* at 299 (citation omitted). The Fifth Circuit stated that ("there must be language in the instrument which leads to the logical conclusion that it was the intention of the parties that a security interest be created."); *Sommers v. IBM,* 640 F.2d 686, 689 (5th Cir. 1981). *Accord In re Bollinger Corp.,* 614 F.2d 924 (3d Cir.1980) ("writing should demonstrate an intent to create a security interest in the collateral." *Id.* at 928); *In re Bossingham, supra* at 350 ("specific 'words of grant' are not required").

A "security interest" is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." Tex.Bus. & Com.Code Ann. § 1.201(37) (Vernon Supp.1989). The Fifth Circuit in *Looney v. Nuss (In re Miller),* 545 F.2d 916 (5th Cir.) *cert. denied,* 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977) outlined the principal test to be used in determining whether a transaction is to be treated as a security interest. The appellate court stated that where a transaction is intended to have the effect of creating a security interest, this creation requires no formal wording; rather the court is to examine the substance of the documents in light of the circumstances of the case, in view of the fact that:

[t]he Code eliminated traditional formal distinctions among security devices and left room for new forms of secured financing to 'fit comfortably under its provisions' without the necessity of passing new statutes and amending existing ones. The principal test for determining whether a transaction is to be treated as a security interest is: '[I]s the transaction *intended* to have effect as security?' No formal wording is required; we are to examine the substance of the documents, in light of the circumstances of

the case (citations omitted) (emphasis in original).[3]

*Id.* at 918.

The U.C.C. does not require special words or any special form to show a possible security interest. *White & Summers, supra* at 301. Further, the courts have recognized unorthodox documents containing certain words as adequate security agreements.[4] Even when conventional words do not appear, some courts find security interests. *Clark v. Vaughn,* 504 S.W.2d 550, 553 (Tex.Civ.App.—Dallas 1973, writ ref'd n.r.e.). Or, where one document is not sufficient to create a valid security interest, creditors may show such creation by introducing multiple executed documents.[5] Therefore, once the agreement meets the § 9.203 writing requirement, the court may or may not ask for other evidence of whether the parties *actually* intended to create a security interest, a question of fact. *White & Summers, supra* at 300.

Since § 1.201(3) (Vernon 1968) defines agreement as "the bargain of the parties in fact as found in their language or by implication from other circumstances ...," the writing which satisfies the statute of frauds will also serve as sufficient proof of an actual intent to create such an interest. Where this is the case, no further questions are necessary. However, in a problem case, where the writing barely meets the objective test, further facts may be necessary to show whether the parties also actu-

ally intended to create a security interest. *See Semco Division, Delwood Furniture Co. v. Williams (In re Metzler),* 405 F.Supp. 622 (N.D.Ala.1975).

The *Metzler* court found that the "fundamental requirement of meeting of the minds is inherent in such agreements, as it is in all contracts. Without a contract there can be no security interest." *Id.* at 625. "Some courts have focused on the debtor's intention at the time of contract formation. The burden is on the creditor to establish the intention.... The question is what did the debtor agree to?" *White & Summers, supra* at 300 n. 14. Parole evidence is admissible to inform the second inquiry, but not the first. *Id.* at 300 (citing *In re Lockwood,* 16 U.C.C. 195, 200 (Bankr. D.Conn.1974)). This conclusion follows from the definition of "agreement" in § 1.201(5). *See In re Lockwood, supra* at 200 ("[p]arole evidence is admissible to reveal the actual negotiations of the parties in arranging the transaction and any supplemental oral discussions of the parties which demonstrate their true intentions and understanding of the transaction"). In the case *Improved Mach. Inc. v. Delta Molded Products, Inc. (In re Delta Molded Products),* 416 F.Supp. 938, 942 (N.D.Ala. 1976), *aff'd,* 571 F.2d 957 (5th Cir.1978), the court noted that "[s]ection 9.203 being in the nature of a statute of frauds, parole evidence is not admissible [only where it is offered] to establish the statutory requirements" of a writing. (citation omitted)[6]

---

**3.** *See also Davis Brothers v. Misco Leasing, Inc.,* 508 S.W.2d 908, 912 (Tex.Civ.App.—Amarillo 1974, no writ) (stating no formal wording is required and the Courts are to examine the substance in light of the circumstances).

**4.** *See, e.g., In re Penn Housing Corp.,* 367 F.Supp. 661 (W.D.Pa.1973) ("to secure"); *In re Munro Builders, Inc.,* 20 U.C.C. 739 (Bankr.W.D.Mich. 1976) (assignment language); *In re Bazaar de la Cuisine Int'l., Inc.,* 20 U.C.C. 1049 (Bankr.S.D.N. Y.1976) ("pledge"); *Komas v. SBA,* 71 Cal.App.3d 809, 139 Cal.Rptr. 669, 22 U.C.C. 550 (Cal. Ct.App.1977) ("security"); *Georgia–Pacific Corp. v. Consolidated Suppliers, Inc.,* 332 So.2d 368, 19 U.C.C. 935 (Fla.Dist.Ct.App.1976) ("lien-holder"); *Copeland v. Stewart,* 18 U.C.C. 200 (Cal. Ct.App.1975) ("collateral").

**5.** Recent multi-document cases in which courts recognized the creation of valid security inter-

ests include: *In re Bollinger, supra; Looney v. Nuss (In re Miller), supra; In re Numeric Corp.,* 485 F.2d 1328, 1332 (1st Cir.1973) (specific words of grant are not required to pass the objective test for intent to create a security interest); *In re Sunrise Farm Market,* 59 B.R. 762 (Bankr.N.D.Ohio 1986); *Still v. People's Nat'l Bank of Shelbyville, Tenn., (In re Baker),* 54 B.R. 743 (Bankr.E.D.Tenn.1985); *In re Smith,* 47 B.R. 482 (Bankr.N.D.Ohio 1985). *Contra, In re Taylor Mobile Homes, Inc.,* 17 U.C.C. 565 (Bankr.E.D.Mich.1975).

**6.** *See also White & Summers, supra* at 300 n. 16 (citing *In re E.F. Anderson & Son, Inc.,* 12 U.C.C. 567, 571 (Bankr.M.D.Ga.1973) (unattached list of collateral results in ineffectiveness of security agreement; despite clear indication of intended collateral on certificates of title, "[e]quity will reform an instrument but it will not make one"); Weinberg, *Toward Maximum Facilitation*

Extensive research by the Court indicates many cases in which Sears seeks to assert its status as a secured creditor by virtue of a purchase money security interest in consumer goods. In all the cases in which Sears was involved as the creditor, as well as every other case researched for this opinion, the security agreement or the documents evidencing a security interest were introduced into evidence at trial. The significance of this fact can hardly be overstated, as proof of the default terms in the security agreement is necessary before the courts would allow creditors to proceed against the Debtor's property in accordance with state laws. *See, e.g., In re Moody,* 62 B.R. 282, 283 (Bankr.N.D.Miss. 1986); *In re Orecchio,* 54 B.R., 685, 686 (Bankr.D.N.J.1985); *Tucker v. Sears, Roebuck & Co. (In re Tucker),* 36 B.R. 706, 707 (Bankr.S.D.Ill.1984); *Sears, Roebuck & Co. v. Hamilton (In re Hamilton),* 22 B.R. 560, 561 (Bankr.D.Del.1982).

### Conclusion

The Court concludes that as a matter of law the sales slips retained a security interest in the items purchased. Clearly Sears intended for the sale slips to be a security agreement and the intention of Mr. Hardage for the sale slips to be a security agreement must be found from the fact that he signed the sales slips immediately below the language creating the security interest.

The debtor and the creditor contemplated a security agreement, and in the instant case the security interest actually arose in spite of the fact that important terms including the method of securing a release from the lien and the terms of payment

were not agreed upon.[7] Presumably Sears expects to be paid for the items listed on the sales tickets, but in its pleadings and argument Sears offered no hint as to how it expected to be paid. In view of its failure to comply with applicable consumer creditor laws, it is doubtful that Sears could be paid in accordance with its "standard terms."[8]

ORDER ACCORDINGLY.[9]

---

*of Intent to Create Enforceable Article Nine Security Interests,* 18 B.C.Indus. & Com.L.Rev. 1, 17 (1976) (on exclusion of parol evidence to establish bare promissory note as security agreement: "Article 9 should be read as requiring that the writing evidence a possible secured transaction".).

7. This Court cannot and should not speculate as to what the parties might have agreed to had they negotiated further, nor should this Court consider as the terms of the transaction Sears' "standard deal" because the parties never agreed to those terms.

8. The Court uses the term "standard terms" on the assumption that Sears has some type of standard terms for consumer credit transactions. No evidence of any such terms was introduced.

9. This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052 which is made applicable to Contested Matters by Bankruptcy Rule 9014.