**In re Daniel & Ellen BECK, Debtors.**

**In re Carlos A. & Lisa M. Alvear, Debtors.**

**Bankruptcy Nos. 98–13449 K, 98–14139 K.**

United States Bankruptcy Court, W.D. New York.

May 1, 2000.

Barry H. Sternberg, Amherst, New York, for the debtors.

Jonathan D. Deily, Deily, Dautel & Mooney, LLP, Albany, New York, Philip D.

Anker, Wilmer, Cutler & Pickering, Washington, DC, for Sears National Bank.

### MICHAEL J. KAPLAN, Bankruptcy Judge.

These two claims objections, consolidated for purposes of hearing and decision, pick up where the Second Circuit Bankruptcy Appellate Panel left off in the case of *In re Oszajca,* 207 B.R. 41 (2d Cir. BAP 1997). In that case, the Second Circuit BAP held that in the state of Vermont, Sears, Roebuck & Company was entitled to look exclusively to the Uniform Commercial Code in perfecting a purchase money security interest ("PMSI") in goods purchased at retail pursuant to a revolving charge agreement. The BAP rejected the argument that the Vermont Retail Instalment Sales Act ("RISA") impliedly prohibited the taking of security interests in goods purchased under a retail credit "agreement" (as opposed to a retail credit "contract") covered by RISA. (A retail credit agreement is a typical "revolving" charge account.) The BAP, in dictum, noted that the RISAs of only two states that it knew of specifically prohibited the retention of a security interest in connection with a retail charge agreement, one of which was New York. N.Y. Personal Property Law § 413(12) (McKinney 1996) stated that "No retail instalment credit agreement or any agreement executed in connection therewith, may provide for the creation of a security interest in any personal or real property (including any goods sold under such agreement) to secure payment of the buyer's outstanding indebtedness under such retail instalment credit agreement."

The BAP clearly was not then aware that several months earlier there became effective a massive overhaul of the New York RISA, not simply repealing the above-quoted proposition, but expressly permitting the taking of purchase money security interests in retail goods sold for $200 or more, as discussed below.

The Chapter 13 Debtors in these consolidated claims objections argue, despite the 1996 amendments, that Sears National Bank ("SNB"), which is a Sears affiliate, cannot acquire a valid security interest in retail goods simply by means of an account-holder's signature at the bottom of the sales draft that identified the goods and proclaimed the grant of a security interest. But the Debtors do not, and cannot, point to any provision of New York's RISA or any other New York statute that establishes that SNB may not rely upon the Uniform Commercial Code and the sales draft, whether that lender is subject to the N.Y. RISA or not.

This Court finds that the New York State Legislature, over time, has so completely dismantled the New York RISA as a consumer protection device, and has erected such an edifice of lender-protection upon the RISA's ashes, that it has left no doubt that the Debtors cannot prevail here—that the ultimate holding in the *Oszajca* case (where the Vermont statute was simply silent on the taking of a security interest in connection with a retail instalment credit agreement) is even more compelling here in New York where the taking of a PMSI is now expressly approved in the RISA without any specific instructions as to how the lender is to take the interest.

A ruling for Sears must issue.

### THE PARTIES' ARGUMENTS

These two Chapter 13 Debtors challenge Sears National Bank's claim of "secured" status because in Chapter 13 debtors must pay secured claims in full, and they believe that the RISA cannot make the taking of a security interest so facile. (These are small claims but Debtors' counsel diligently represents a great many consumer debtors in this Court each year, and these are "test cases.")

In the Beck case, security is claimed to the extent of $303.87, stemming from the Debtors' purchase, on February 17, 1997, of a "microhood" for $307.79 plus tax. In the Alvear case, security is claimed in the

amount of $404.99, stemming from the Debtors' purchase of a refrigerator, on July 27, 1997, for $499.99 plus tax and delivery charges.

Mr. Beck signed the sales draft under a description of the "microhood" and under the following pre-printed language on the draft:

> PURCHASED UNDER MY SEARSCHARGE AGREEMENT, INCORPORATED BY REFERENCE, I GRANT SEARS A SECURITY INTEREST IN THIS MERCHANDISE UNTIL PAID, UNLESS PROHIBITED BY LAW.

$332.41.

Ms. Alvear signed a similar sales draft, describing the refrigerator and under the following language:

> PURCHASED UNDER MY SEARS ACCOUNT AND SECURITY AGREEMENT, INCORPORATED BY REFERENCE. I GRANT SEARS A SECURITY INTEREST IN THIS MERCHANDISE UNTIL PAID, UNLESS PROHIBITED BY LAW.

$561.74.

It appears to be undisputed that if the U.C.C. alone were to govern the transactions, these executed sales drafts would suffice to grant to Sears a purchase money security interest which, because it involves consumer goods, need not be filed in order to be perfected.[1]

What is disputed is whether the New York Retail Instalment Sales Act governs the transactions *to the exclusion of* the U.C.C.

The Debtors argue that although Sears National Bank is a wholly-owned subsidiary of another company that is a wholly-owned subsidiary of the Sears, Roebuck retail chain, there is no enforceable distinction between Sears National Bank and Sears, Roebuck in the cardholder's mind, and so the transactions should be governed by the New York Retail Instalment Sales Act because clearly the transactions would be so governed if it were to be Sears, Roebuck, rather than Sears National Bank, that were to be providing the financing for the transaction. (See N.Y.Pers.Prop.Law §§ 401.6, 402) (McKinney 1992 and Supp.1999.)

If the New York Retail Instalment Sales Act applies, they assert, then the alleged grant of a security interest should fail because the sales draft does not contain the formal requisites of a retail instalment sales agreement. (As discussed later, however, the Debtors can point the Court to no specific provisions of the New York RISA that would apply to such grants of a security interest.)

Sears National Bank ("SNB") counters that it is a federally-chartered bank, doing business in the State of Arizona, and that as a matter of federal law that pre-empts state law on the subject, it is not extending credit in the state of New York for purposes of the New York Retail Instalment Sales Act. It insists that by contract with its account holders, as well as in accordance with federal law governing the conduct of its business, it is extending credit under the law of the State of Arizona only; consequently, the New York Retail Instalment Sales Act cannot and does not apply,

---

1. SNB cites the following cases for the proposition that under the U.C.C. alone, it has a good PMSI:

    *Boudrow v. Sears, Roebuck & Co.,* 27 U.C.C.Rep.2d 1432, 1995 WL 96958 (D.Mass.1995); *In re Mayton,* 208 B.R. 61, 63 (9th Cir. BAP 1997); *In re Weir,* 173 B.R. 682, 684 (Bankr.E.D.Cal.1994); *In re Hance,* 181 B.R. 184, 186–87 (Bankr. M.D.Pa.1993); *In re Tillery,* 124 B.R. 127, 129 (Bankr.M.D.Fla.1991); *In re Wiegert,*

    145 B.R. 621, 622–23 (Bankr.D.Neb.1991); *In re Hardage,* 99 B.R. 738, 742 (Bankr. N.D.Tex.1989); *In re Stanley,* 57 B.R. 329 (Bankr.S.D.Fla.1986); *In re Moody,* 62 B.R. 282 (Bankr.N.D.Miss.1986); *In re Orecchio,* 54 B.R. 685, 687 (Bankr.D.N.J.1985); *In re Tucker,* 36 B.R. 706 (Bankr.S.D.Ill.1984); *In re Schwartz,* 27 B.R. 195 (Bankr. S.D.Ohio 1982); *Sears, Roebuck & Co. v. Silch,* 899 S.W.2d 153, 155 (Mo.Ct.App. 1995).

and it is only perfection under the U.C.C. that is required.

In the alternative, SNB argues that if it is subject to the New York State Retail Instalment Sales Act, it has fully complied therewith in all the respects in which retail instalment credit "agreements" are subject to that statute. SNB reminds the Court that "retail instalment credit contracts" are distinct from "retail instalment credit agreements," and that as to the latter the matter of whether any security interest is taken in the collateral or not is not material.

Furthermore, since November of 1996, the New York RISA specifically permits the taking of security interests in goods purchased for $200 or more on a revolving charge account. Thus, since November, 1996, there has been nothing in the New York Retail Instalment Sales Act that would nullify such security interests. And so, the Bank notes even if it is subject to the Retail Instalment Sales Act, it is only the "agreement" that is so subject, and SNB is free to obtain its purchase money security interest under the U.C.C. without violating any provision of state law.

Finally, Sears National Bank argues that even if it is subject to the New York Retail Instalment Sales Act, and is found to have violated it, there is nothing in that act that provides for loss of security interest as a penalty, and U.C.C. § 9–102(4) specifically states, in reference to the Retail Instalment Sales Act, that "failure to comply [therewith] has only the effect which is specified therein." Hence, noncompliance with that Act does not cause the loss of a lien duly obtained under the U.C.C., now that the N.Y. RISA no longer voids security interests like those taken here.

## DISCUSSION

■ The Court has searched the Debtors' arguments looking for some clear statement as to why the claimed security interests must fail, assuming arguendo that they are subject to the RISA rather than to the U.C.C. The search was fruitless, as it must be, given what the New York Legislature did to the RISA in 1996. The New York RISA was first enacted in 1957, and until September 1, 1971, it was very similar to the Vermont RISA addressed in the *Oszajca* case, in that the provisions dealing with a retail instalment credit agreement were silent regarding the taking or not taking of a security interest.

But the *Oszajca* case rested on an argument about statutory silence. Here, on September 1, 1971, the specific provision dealing with retail instalment credit agreements was amended by adding the following language: "No retail instalment credit agreement, or any agreement executed in connection therewith, may provide for the creation of a security interest in any personal or real property (including any goods sold under such agreement) to secure payment of the buyers' outstanding indebtedness under such retail instalment credit agreement. Any such prohibited provision shall be void but shall not otherwise affect the validity of such retail instalment credit agreement." N.Y.Pers.Prop.Law § 413(12). (See 1975–1976 "Cumulative Annual Pocket Part" to the 1962 edition of McKinney's Personal Property Law.)

That particular provision remained that way until an August 8, 1996 enactment became effective on November 6, 1996. Thus, at the time that Beverly Oszajca prevailed at the trial court level in June of 1996 (*In re Oszajca*, 199 B.R. 103 (Bkrtcy. D.Vt.1996)) Sears presumably would not have even claimed a security interest in the State of New York, rather than Vermont.

But while the *Oszajca* appeal was wending its way to the BAP, the New York Statute was changed to read as follows, in pertinent part:

"... a retail seller, or financing agency which enters into a retail Instalment credit agreement with a retail buyer on behalf of a retail seller named in the agreement, may take or retain a pur-

chase money security interest, as that term is defined in § 9–107 of the Uniform Commercial Code, in any item of merchandise purchased at a price of not less than $200 pursuant to a retail Instalment credit agreement until the purchase price of such merchandise is fully paid, but in no event shall any purchase money security interest created hereunder be valid or enforceable for a period greater than five years from the date a purchase is posted to any account which may be used to purchase an item of merchandise at a price less than $200."

N.Y.Pers.Prop.Law § 413(12)(c) (McKinney Supp.1999).

This was set forth as an exception from the general rule, that

"No retail instalment credit agreement, or any agreement executed in connection therewith, may provide for the creation of a security interest in any personal or real property (including any goods sold under such agreement) to secure payment of the buyer's outstanding indebtedness under such retail instalment credit agreement. Any such prohibited provision shall be void but shall not otherwise affect the validity of such retail instalment credit agreement."

N.Y.Pers.Prop.Law § 413(12)(a) (McKinney Supp.1999).

This means that New York law did a complete about-face. Now there was explicit permission for the taking of PMSIs by revolving charge lenders as a statutory "carve out" from an otherwise unequivocal prohibition.

Also important, for today's purpose, is that when the Legislature enacted this carve-out, it offered no express guidance as to how one actually is to obtain the lien that was now permitted. Was the grant of the lien required to be set forth in the retail instalment credit agreement itself? If not, was some kind of specific and conspicuous language to be contained in whatever the debtor was executing that would

constitute the grant of the lien? Were the same kinds of financial disclosures that are required in retail instalment sales *contracts* to be made every time the debtor granted a lien under a retail instalment credit *agreement?* These and other questions were left unanswered.

So even if SNB were to concede the applicability of the New York RISA to the transactions in question, its arguments would not change. Nothing in the New York RISA sets forth any special requirements of form or content for any grant of a lien that is permitted as to a retail instalment credit agreement. So should not the U.C.C. prevail?

New York went from a fourteen year period of statutory silence on the matter of the taking or not taking of a security interest with regard to a retail instalment credit agreement (creating a situation identical to that presented under Vermont Law in *Oszajca*), to a twenty-five year period in which the taking of such lien was expressly prohibited and void, to the present period where the taking of such liens is expressly permitted, but no statutory mechanism for the taking of such liens is described. This Court concludes that the present law of New York requires the same result that the BAP reached under circumstances in which it was dealing with statutory silence regarding the taking of liens—that is, that the lender is free to look exclusively to the U.C.C. for the taking and perfection of the lien.

■ Before reaching this result, this Court examined the complete RISA, as it now exists in this state, looking for a context within which these Debtors' arguments for some kind of "implied" rule requiring something "more" than a sales slip, might still offer merit. During that examination, this Court found earlier amendments that are so profoundly in derogation of the initial consumer-protection purposes of RISA, that the Court is left with no doubt that no inferences may be drawn in favor of any consumer or debtor from what remains ambiguous in this statute. The

Court need cite only one other amendment to support this. In 1989, § 413.3(e) was amended to add provisions that not only permit unilateral changes to be made to the instalment credit agreement by the lender with binding effect on the borrower if the borrower used the card after receiving notice of the change, but also gave express effect to unilateral changes made by the lender if the borrower/buyer simply fails to act. Together, these provisions read as follows:

> "Any buyer who has received a notice ... who does not agree in writing to the change and no further indebtedness is incurred under the plan to which the agreement relates, and any buyer who gives a timely notice ... electing not to accept the change shall be permitted to pay his outstanding indebtedness in accordance with the terms of the retail instalment credit agreement but the seller or holder may terminate the amount of credit available to the buyer and may require the buyer to return all credit cards issued in connection with a retail instalment credit agreement. If such a buyer subsequently uses a credit card to obtain credit under a retail instalment credit agreement, such use shall constitute acceptance of the change of terms and shall be deemed to have been accepted and shall become effective as to the buyer as of the date such change would have become effective but for the giving of notice by the buyer. If notice is given ... and the buyer does not timely object in writing to the change, such change shall become effective *without action on part of the buyer....*" [emphasis added.]

N.Y.Pers.Prop.Law § 413.3(e) (McKinney Supp.1999).

Such a provision would make good sense if it were among "merchants" under Article 3 of the Uniform Commercial Code. But its enactment in the New York RISA strips individual consumers of the common law defenses of offer and acceptance, unconscionability, and contracts of adhesion, etc. When such express statutory abrogation of such fundamental principles of contract law appears in what began as a consumer-protection statute, that statute is no longer worthy of that label.

■ All that being said, this Court must apply the law as it is written.

■ The statutory void created by the repeal of the absolute prohibition against the taking of security interests like those involved in this case may properly be filled by SNB's taking of a "naked" PMSI pursuant to the sales draft. If this is not in accordance with what the State Legislature intended, it must amend the statutes.

### SNB's ASSERTION THAT IT IS NOT SUBJECT TO NEW YORK RISA

Although not necessary to the holding, the Court will address one argument that was made by SNB as an alternative argument in the event that the Court might somehow find an answer in the RISA as to how its lien must be taken, to the exclusion of the U.C.C.

In arguing that it is not subject to the New York RISA, the first prong is that SNB is a legal entity distinct from Sears, Roebuck and is a federally-chartered national bank regulated by the federal Office of the Comptroller of the Currency and insured by the FDIC. Of course, it is an affiliate of Sears, Roebuck, but it does not sell goods or services to retail customers in New York. Its sole location is in Tempe, Arizona, and, as required under federal law, it extends credit from Arizona and does not extend credit from New York or any other state in which a cardholder happens to use his or her card to make a particular purchase.

Thus, SNB argues that it is not subject to state laws such as the New York RISA, which laws by their own terms can only apply to agreements "entered into in the state" (with certain exceptions not here implicated). (See N.Y.Pers.Prop.Law § 401.8 (McKinney 1992).)

Additionally, SNB argues that this result was contracted-for in the Alvear case.[2] In that particular case, the April 1997 version of the agreement in effect stated that "this agreement is entered into in Arizona and all credit under the agreement will be extended from Arizona." The agreement, however, also contained, among the various captions at the top, the notation "RETAIL INSTALMENT CREDIT AGREEMENT (N.Y.)" and also contained a provision that stated that "In New York, to the extent applicable, the provisions of the Retail Instalment Sales Act ... shall apply."

And SNB cites the case of *Marquette Nat'l Bank of Minneapolis v. First of Omaha Svc. Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978) for the proposition that as a national bank, it extends credit only from Arizona.

Thus, SNB argues that as a matter of federal statute (and preemption); and under the language of the New York RISA itself; as well (in the Alvear case) as the language of the contract between the parties: the New York RISA does not apply to its extensions of credit to its cardholders in New York.

This Court's holding is such as to permit the Court to assume arguendo that SNB is susceptible to the requirements of the New York RISA. And so it is not necessary for the Court to determine this question one way or the other. However, the Court offers this dictum.

No proposition of law has been posited that would prohibit any entity that is statutorily or constitutionally insulated from the application of state laws, from voluntarily submitting itself to such application.[3] Even if so submitting itself would constitute a violation of federal law that would make it vulnerable to fine, penalty, forfeiture, or other federal remedy, it is by no means clear that state citizens or state agencies that dealt in good faith and on the expectation and understanding that the submission to state law was legally enforceable, would not be able to enforce said state remedies.

At oral argument in the case at bar, the Court asked counsel for SNB why the New York RISA is so prominently incorporated by name into the agreements in question if it is SNB's position that these agreements are not subject to New York's RISA. The response was that this constitutes "belt and suspenders"—SNB's effort to protect itself in more ways than one. But when the Court pressed at oral argument as to why this approach was taken, as opposed to the ubiquitous this is not ... approach—for example, "this is *not* an offering for which a prospectus is required under the laws of ...,"—the response was, essentially, that although present counsel did not draft those agreements and might not have used the same language, it was "belt and suspenders" nonetheless.

In this Court's view, this effort at "belt and suspenders" is an effort by Sears National Bank to have its cake and eat it too. It is true that the Supreme Court decision in *Marquette* held that the mere fact that a Nebraska bank enrolled Minnesota resi-

---

**2.** Not in the Beck case. SNB acknowledges that in the Beck case the September 19, 1996 version of the credit agreement in effect specifically said that although "this agreement and my account will be governed by and interpreted in accordance with the laws of the State of Arizona and the United States, regardless of where I live or where I use my account," it went on to say "that the laws of my state of residence will apply to the security interest granted herein."

And it specifically told residents of New York that "a security interest under the Uniform Commercial Code will be taken to the extent permitted by law to secure only the purchase price of each item of merchandise purchased from Sears, Roebuck & Company, its affiliates and licensees." And, as was the case in Alvear, the agreement also stated that in New York, "the provisions of the Retail Instalment Sales Act," shall apply "to the extent applicable...."

**3.** SNB emphasizes that it "may" only extend credit "in" Arizona. That does not mean that it "cannot" make itself subject to New York law by its own actions.

dents, merchants, and banks in its bank card program did not suffice to "locate" that bank in Minnesota for purposes of 12 U.S.C. § 85 (the federal interest-rate statute). And it is true that the High Court in that case noted that even the fact that a national bank transacts business, or even *violates* the Securities Exchange Act of 1934, in a state other than that of its "organization certificate," does not suffice to "locate" the bank in the foreign state for purposes of venue under 12 U.S.C. § 94 (the National Bank Act venue provision). But *Marquette* says nothing about a situation in which a national bank comes into a state, specifically declares that it is observing a particular state statute (but only "to the extent applicable"), derives benefits from the statute,[4] and yet claims that it is not subject to the burdens of that statute.[5] If this were a case in which the question had to be decided, the Court likely would not find *Marquette* alone dispositive.

## CONCLUSION

There being no claim that the sales drafts were insufficient to give Sears a purchase money security interest under the U.C.C., so long as such security inter-

ests were not prohibited by the New York RISA, and it having been found by the Court that such security interests are not prohibited by the New York RISA so long as the notice provisions of RISA were met (and there is no argument that they were not) and so long as the items' purchase prices were at least $200 (which they were) the objections to SNB's secured claims are overruled.

SO ORDERED.

---

4. It is too speculative to opine that some consumers may have been lulled into a false sense of security by seeing the agreement contained specific references to New York RISA, even as to those consumers who may have believed that New York RISA is a consumer-protection statute. However, at oral argument counsel for SNB advised the Court that both Alvear and Beck had received earlier notices, not in evidence, that future unilateral changes in the provisions of their revolving credit agreements would be binding on them if, once notified of those future changes, they did not write to Sears to cancel their charge cards. In the State of New York, such a methodology is *ipso facto* binding only by virtue of the statutory provisions contained in New York RISA, quoted above. Such methodology may or may not be binding under general principles of contract law, and it may or may not be *ipso facto* binding under statutory provisions of other states. But it is not speculative to assume that Sears would point to New York RISA in an action on the contract if the argument were made that the methodology failed as a matter of contract law. Certainly if Sears were to do so in a

legal action, judicial estoppel would bind it from later claiming that it is not subject to New York RISA.

5. This case would not appear to be too dissimilar to such cases as *Grand Rapids & Indiana Railway Co. v. Osborn*, 193 U.S. 17, 24 S.Ct. 310, 48 L.Ed. 598 (1904) (the acquirer of a railroad availed itself of the privileges and benefits of Michigan law of corporations, and was found to be estopped thereby from repudiating the burdens of the statute) and *Booth Fisheries Co. v. Industrial Commission of Wisconsin*, 271 U.S. 208, 46 S.Ct. 491, 70 L.Ed. 908 (1926) (an employer's election to become subject to the state's Workmen's Compensation Act "may not escape its burdens by asserting that [the Act] is unconstitutional. The election is a waiver and estops such complaint.") But see dictum in *Witek v. State of Wisconsin*, 2 Wis.2d 404, 86 N.W.2d 442 (1957), to the effect that one who accepts a license which merely permitted him to do what he had a legal right to do anyway, could challenge the licensing statute when charged with a violation thereof.