**In re Freddie P. McCALL, Debtor.**

**SKINNER'S FURNITURE STORE OF GREENVILLE, INC., Appellant,**

v.

**Freddie P. McCALL, Appellee.**

**Civ. A. No. 84–T–256–N.**

United States District Court,
M.D. Alabama, N.D.

Oct. 4, 1985.

B. Blaine Brown, III, Wood, Minor & Parnell, Montgomery, Ala., and L. Thomas McLane, West Point, Ga., for appellant.

**58**

Abigail P. van Alstyne, Legal Services Corp. of Ala., Montgomery, Ala., for appellee.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

This appeal from the bankruptcy court's denial of appellant Skinner's Furniture Store's claimed purchase money security interest in certain household goods of appellee Freddie P. McCall raises a single issue: Whether the store's purchase money security interest in the property it sold to McCall was destroyed when it made an additional sale under the same agreement. The bankruptcy court held that the store's purchase money security interest was destroyed. For the reasons stated below, this court is of the opinion that the store's purchase money security interest was not destroyed and that the decision of the bankruptcy court is therefore due to be reversed.

### I.

On May 14, 1982, McCall entered into an agreement to purchase several pieces of furniture from Skinner's Furniture for a total price of $3,182.40. McCall agreed to pay for voluntary credit life insurance and property insurance and further agreed to pay a finance charge calculated according to the balance due at the end of each month. On May 18, 1982, McCall made an additional credit purchase from the store under the same agreement and sent monthly installment payments totalling $1,050.00 over a fourteen month period. McCall missed several scheduled payments.

On August 1, 1983, McCall filed a chapter seven bankruptcy petition, claiming a personal exemption for the furniture under 11 U.S.C.A. § 522(f) and 1975 Alabama Code § 6–10–6. Skinner's Furniture objected to the claimed exemption, arguing that under 1975 Alabama Code § 7–9–107 it held a purchase money security interest in the goods that was superior to all other liens and McCall's claimed personal exemption. McCall responded that the store's interest

in the property was a non-purchase money security interest and was therefore avoidable. After a hearing on the store's objection, the bankruptcy court held that McCall's claimed personal exemption was valid. The court reasoned that her initial purchase created a purchase money security interest in the furniture, but that her May 18, 1982, credit purchase of additional property automatically transformed the store's interest into a non-purchase money security interest.

### II.

While much of the discussion of purchase money security interests tends to be highly technical, its significance to both buyers and sellers is basic and fundamental. The ability to create and maintain a purchase money security interest will very often determine the type and quantity of credit sellers can offer to buyers.

A purchase money security interest is like an insurance policy. It offers the seller a number of protections. *See generally* Note, *Preserving the Purchase Money Status of Refinanced or Conmingled Purchase Money Debt*, 35 Stan.L.Rev. 1133, 1154 (1983) (hereinafter cited as Note, *Preserving Purchase Money Status*). The most important protection is that the seller's interest in the goods is generally guaranteed even if the buyer files for bankruptcy. The seller who has a purchase money security interest in goods holds a powerful trump card in any bankruptcy proceeding. The buyer for the most part cannot ask for an exemption under any of the Bankruptcy Act's provisions, and the seller's interest is automatically superior to the claims of rival creditors who might be fighting for the same property.

This special protection afforded by the creation of a purchase money security interest benefits the buyer as well. Since the seller's risk is significantly reduced by this "insurance", he can offer credit at a lower rate to the buyer. Note, *Preserving Purchase Money Status* at 1154.

However, any system is open to abuse. Sellers have often overreached by consol-

idating more than one purchase under the same purchase money credit agreement and arranging the transaction in such a way that they retain title to all of the goods until the last item has been paid off. This practice, which allows sellers to keep goods under a purchase money security interest long after the buyer has made payments equalling the value of individual items, has serious adverse consequences for the buyer. In a bankruptcy proceeding, the seller can reclaim *all* of the goods he sold even though the buyer has made substantial payments towards some of them.

Faced with such abuses, courts have held that the seller's original purchase money security interest is automatically "transformed" into a regular security interest when additional purchases are added on to the first sale. In *In re Manuel,* 507 F.2d 990 (5th Cir.1975), for example, the buyer purchased 7 pieces of furniture on credit and later added a television to the same agreement. That agreement provided that "[s]eller's security interest in the goods sold shall remain perfected until full payment for said goods sold shall be made." *Id.* at 992. The Former Fifth Circuit held that, on those facts, the second sale "transformed" the seller's original purchase money security interest into an ordinary security interest. In so holding, it stressed that the agreement's central flaw was that it "failed to indicate the order in which purchases were paid off, and the amounts still due on each item." *Id.* at 991–992. However, it left open the possibility that an agreement that allocated payments according to a first-in, first-out schedule might lead to a different result. *Id.* at 993.

Since *Manuel,* courts have recognized that a purchase money security interest can survive an "add-on" sale when express contractual language allocating payments

is present. *See* Note, *Preserving Purchase Money Status* at 1145 & n. 49. Instead of seeing an additional sale as causing a total transformation of the interest, courts recognize that the seller can still hold a purchase money security interest in the goods "to the extent" those goods secure their own price. However, to the extent those goods have been released from the credit agreement by the application of monthly payments, the seller cannot claim a purchase money security interest.[1] This approach, which recognizes that an additional purchase does not always cause a total transformation of the interest, has come to be known as the "dual status" rule. The Eleventh Circuit recently noted in dicta that this dual status rule might apply when a seller "contractually provides some method for determining the extent to which each item of collateral secures its purchase money." *Southtrust Bank v. Borg-Warner Acceptance Corp.,* 760 F.2d 1240, 1243 (11th Cir.1985).

### III.

In the present case, the issue reserved in both *Manuel* and *Southtrust* is squarely presented: Whether inclusion of express contractual language allocating payments according to a first-in, first-out schedule will allow the seller's purchase money security interest to survive.

The store's purchase credit agreement contains just the sort of express contractual language contemplated in *Manuel* and *Southtrust:*

> Buyer hereby grants to Seller a purchase money security interest under the Uniform Commercial Code in all goods purchased hereunder. All goods purchased from Seller shall remain subject to such security interest until their purchase price is paid in full. For such purposes all payments shall be applied first to the

---

1. This approach is supported by the statutory definition of a purchase money security interest:
   > A security interest is a purchase money security interest *to the extent that* it is
   > (a) taken or retained by the seller of the collateral to secure all or part of its price ...

1975 Alabama Code § 7–9–107 (emphasis added); *see also Southtrust Bank v. Borg-Warner Acceptance Corp.,* 760 F.2d 1240, 1243 (11th Cir.1985).

finance charges (including cost of collection), secondly to cost of services, and finally to goods. Payments applied to goods shall be applied in the order in which said goods were purchased; for goods purchased at one time, the amount due for goods having the lowest purchase price shall be deemed to have been paid for first.

After a careful review of the policies underlying the creation of purchase money security interests, this court concludes that the store's agreement not only created, but also maintained a purchase money security interest in the goods sold.

The first-in, first-out allocation method, as its name suggests, applies payments to debts in the order in which those debts are incurred. Under this system, old debts are paid off before payments are applied to new debts. This type of allocation scheme supports the policy of encouraging more favorable credit terms since sellers still retain a purchase money security interest in each item of collateral until that item is paid for. At the same time, the first-in, first-out system protects buyers from overreaching creditors since add-on agreements cannot be used as a pretext for retaining title to all of the goods until the total debt is paid off. *See, e.g., In re Linklater,* 48 B.R. 916, 919 (B.Ct., Nev.1985). Thus, add-on agreements with first-in, first-out allocation clauses satisfy the policies underlying both the dual status and transformation rules. *Id.* For this reason, leading authorities have concluded that a credit agreement that includes a first-in, first-out clause should withstand judicial scrutiny in an add-on context. *E.g.,* J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code,* § 23–7 at 801–802 (1972).

However, one peculiarity of the first-in, first-out clause in Skinner's Furniture's agreement deserves further attention. The clause is not strictly chronological since it first requires bulk payments towards finance and other charges relating to all of the goods. It is only after these payments are made that funds are allocated to specific goods according to their time of purchase. This arrangement, while not purely chronological, is nonetheless mandated by Alabama's Consumer Finance Law:

> Payments received by the seller upon a revolving charge account are deemed, for the purposes of determining the amount of debt secured by the various security interests, to have been applied first to the payment of credit service charges in the order of their entry to the account and then to the payment of debts in the order in which the entries to the account showing the debts were made.

1975 Alabama Code § 5–19–9. To require Skinner's Furniture to include only a purely chronological first-in, first-out allocation schedule would force it to choose between not complying with the Consumer Finance Law and not creating a purchase money security interest. This court is reluctant to present sellers with such a choice.[2]

■ Accordingly, this court concludes that the express contractual language employed by Skinner's Furniture adequately allocated McCall's payments to individual items and provided a ready mechanism for determining the extent to which Skinner's Furniture held a purchase money security in the goods sold.

### IV.

■ McCall's alternative argument that a purchase money security interest was never created must also be rejected. McCall argues that collateral can only secure "all or part of its price" under 1975 Alabama Code § 7–9–107(a). Here, McCall continues, the collateral secures more than its price since Skinner's Furniture included

---

**2.** The court notes that Skinner's Furniture's credit agreement provides that, in addition to credit service charges, collection fees and costs of services shall be discharged before any monthly payments are allocated to goods in the order they were purchased. While there is some question whether the Consumer Finance Law would support this practice, *see* 1975 Alabama Code § 5–19–1(1), McCall does not argue that such charges were actually at issue in this case. Therefore, the court need not decide this issue.

finance and other charges in the cost of the goods.

This court cannot accept the narrow reading of the term "price" advanced by such an argument. McCall would have this court limit that term to "cash price", where commercial reality indicates that most goods sold under these arrangements are sold for a "credit price" that includes finance, insurance, and other charges as part of the purchase price. The general policy advanced by purchase money security interests and the encouragement of credit sales would be thwarted if this court were to limit "price" to cash price. *See* McClaughlin, *"Add on" Clauses in Equipment Purchase Money Financing: Too Much of a Good Thing*, 49 Fordham L.Rev. 661, 665–673 (1981).

An appropriate judgment will be entered reversing the decision of the bankruptcy court and remanding this cause for further proceedings consistent with this memorandum opinion.