**In re Beverly OSZAJCA, Debtor.**

**Beverly OSZAJCA, Debtor, Plaintiff,**

**v.**

**SEARS, ROEBUCK & CO., Defendant.**

**In re Russell N. BROWN, Sheila
L. Brown, Debtors.**

**In re Ann–Marie PERRY, Debtor.**

**Bankruptcy Nos. 95–10300,
95–10552, 95–10180.
Adv. No. 95–1079.**

United States Bankruptcy Court,
D. Vermont.

June 28, 1996.

J. Hollar, Wilson & White, P.C., Montpelier, Vermont, for Beverly Oszajca, Debtor.

G. Rees, Lobe & Rees, Burlington, Vermont, for Sears, Roebuck & Company.

T. Taylor, Law Offices of Todd Taylor, P.C., Burlington, Vermont, for Debtors Russell and Sheila Brown and Ann Marie Perry.

## MEMORANDUM DECISION

FRANCIS G. CONRAD, Bankruptcy Judge.

The issue in these consolidated actions comes before us[1] upon cross-motions for summary judgment in the *Oszajca v. Sears* adversary proceeding. The debtors in the other two cases have asked that their fates be determined according to our resolution of

1. Our subject matter jurisdiction over this controversy arises under 28 USC § 1334(b) and the General Reference to the Court under Part IV of the Local District Court Rules for the District of Vermont. This is a core matter under 28 USC § 157(b)(2)(A). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable by Fed.R.Bkrtcy.P. Rule 7052.

the underlying issue in the Oszajca case—whether Sears' lending and sales procedures render it secured under Vermont's Retail Installment Sales Act (VRISA).[2] We hold that Sears is not entitled to take a security interest under VRISA and is, accordingly, unsecured. Due to factual differences among the debtors' situations, however, the Brown and Perry cases will be addressed separately following our discussion of the Oszajca issue. We first turn to the validity of the Sears agreement (the "Searscharge" Agreement), as signed by Oszajca.

### OSZAJCA

#### FACTS

Oszajca entered an agreement with Sears to purchase merchandise on credit.[3] On June 10, 1994, she purchased goods in the amount of $2,001.25 by placing the purchases on her new Searscharge account. Oszajca paid only $42 through April 26, 1995, when she filed her Chapter 7 petition. Sears timely filed a proof of claim in the amount of $2,268.38. Sears contends that $1,524.76 of the claim is secured by a purchase money security interest in the items purchased by Oszajca. This figure represents the current value of the items.

Oszajca filed this adversary seeking to avoid Sears' lien on the grounds that it is invalid under VRISA. Specifically, Oszajca argues that because the Searscharge Agreement contained a security agreement, it is a "retail installment contract"[4] which, by statute, cannot charge interest in excess of 18%. Alternatively, Oszajca contends that if the agreement is not a retail installment contract, then Sears is prohibited from taking a security interest. Sears has moved for summary judgment stating that as a matter of law the Searscharge agreement is actually a "retail charge agreement".[5] The statutory sections governing retail charge agreements allow a maximum interest rate of 21% and do not expressly prohibit the taking of security interests. Thus, with no facts in dispute, we must interpret VRISA to determine the nature and limitations of the Searscharge.

### DISCUSSION

We begin by laying out various provisions of the Searscharge Agreement and applicable Vermont law. The Searscharge Agreement at issue provides that the seller takes a security interest in each item purchased. Each item secures only the purchase price of that item; the security for each item is released when that item is paid for. The charge slip signed by each customer with every purchase obtains additional assent to the creation of a security interest, and purports to incorporate the main Searscharge Agreement. The Agreement also provides that payments are applied first to unpaid service charges, next to the earliest item purchased, and then to each successive item as earlier purchased items are paid off. Finally, the Searscharge Agreement provides for finance charges of 1.75% per month on the average daily balance outstanding (21% per year). The customer can avoid these charges by paying off the entire balance at any time.

The only two types of retail credit arrangements permitted under VRISA are a "retail installment contract" and a "retail charge agreement." A retail installment contract is defined as follows:

> [A] contract entered into in this state and designated as a retail installment transaction, *but not a retail charge agreement,* or a document reflecting a sale under it, evidencing an agreement to pay the retail purchase price of goods, or any part thereof, in two or more installments over a period of time, and *pursuant to which title to or a lien upon, or a security interest in, the goods is retained or taken by the retail seller to secure the payment of a price*

---

2. This act is also known as Chapter 61 of Vermont's Commerce and Trade title, Title 9, and is cited as 9 VSA §§ 2401–2410.

3. Sears did not submit a charge agreement signed by Oszajca. The parties, however, have stipulated that Oszajca signed a charge agreement like a sample that was submitted by Sears.

4. 9 VSA § 2401(7). See discussion, *infra,* for definition.

5. 9 VSA § 2401(8). See discussion, *infra,* for definition.

which includes the charge as limited by section 2405 of this title. The term includes, but is not limited to, a chattel mortgage, a conditional sales contract and a contract in the form of a bailment or lease ... The term shall also include any amendment of the retail installment contract in which the parties agree to renew, restate or reschedule the unpaid balance thereof, or to extend the scheduled due date of all or any part of any installment or installments.

9 VSA § 2401(7), emphasis added. A retail charge agreement is defined as:

[A]n agreement *other than a retail installment contract*, which prescribed the terms of retail installment transactions which may be made thereafter from time to time under it, under which the buyer's total unpaid balance thereunder, whenever incurred, is payable in one or more deferred installments and under the terms of which the retail buyer pays a price which includes a charge as limited by section 2406 of this title, which charge is to be computed in relation to the buyer's unpaid balance from time to time.

9 VSA § 2401(8), emphasis added. While the Searscharge Agreement seems to embody characteristics of both types of arrangements, there is one certainty in these definitions: a retail contract cannot be both. We shall exit the world of lawyers, rampant with fuzzy grey middles, and enter the world of sobering practicality. Here, "each thing is what it is," said the poet T.S. Eliot, "and not some other thing."

■ Momentarily skirting the issue of whether Sears is permitted to take a security interest in the goods purchased, we initially find that the Searscharge Agreement is a "retail charge agreement" rather than a "retail installment contract." We agree with Sears that the Searscharge is an "open-end" or revolving credit arrangement which cannot comply with the disclosure requirements imposed upon the "close-end" "retail installment contracts" of 9 VSA § 2405(a)–(q). Retail installment contracts are required to contain certain disclosures such as the total sales price of the items, the total finance charge and the number of installments to be made.

9 VSA § 2405(g)(7), (8) & (9). The Searscharge cannot comply with these disclosure requirements because it allows a customer to pay anywhere between the full balance due and ⅛th of the balance each month. The amount of finance charges and number of installments remaining vary accordingly and cannot be estimated beforehand.

The Searscharge instead squarely fits within the requirements of 9 VSA § 2406 for retail charge agreements. This section prescribes monthly statements which summarize payments made and charges incurred in the previous month. Section 2406 reflects the flexible nature of the Sears-type arrangement. Our analysis is consistent with that of the Senate Finance Committee who, upon discussing the difference between bank credit cards and retail credit cards on April 5, 1979 said:

COMM. LEDBETTER: ... A retail charge agreement is any written agreement to extend credit on a revolving nature to a retail consumer from a retailer. It would include Sears Roebuck ...

SEN. REYNOLDS: ... It can be a retail credit card or it can be simply a retail charge agreement with the Senator's friendly hardware.

We find, then, that the Searscharge Agreement is a retail charge agreement because of its revolving nature. The only remaining issue is whether the Searscharge, a retail charge agreement, may contain security agreements or allow the taking of security and if so, what is the extent of that interest in the case before us.

■ Oszajca argues that the definitions of the two types of agreements dictate that Sears is forbidden from taking a security interest in the goods sold. By definition, a retail installment contract contains a security agreement and a retail charge agreement does not. In fact, a retail charge agreement *cannot* because of the doctrine of *expressio unius est exclusio alterius* which states that omissions of a thing once designated are understood as exclusions. Sutherland Stat. Const. § 47.23 (5th Ed.1992). In other words, because security interests are mentioned in the first definition and not the second, they were meant to be excluded in

the second. This doctrine seems especially plausible because the mention of security is one of the few stated differences between the two types of contracts that the two definitions could be describing.

■ Sears counters Oszajca's argument by pointing to a contrary but equally plausible pillar of statutory construction. This titleless but no less useful doctrine states that "rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language." *Estate of Kelley v. Moguls, Inc.*, 160 Vt. 531, 533, 632 A.2d 360 (1993). Sears points to the fact that the taking of a security interest, as with the traditional conditional sales contract, is a common law right. Such a right should not be deemed abrogated without a statute expressly doing so.

■ When dealing with statutory construction, the starting point in the analysis should be the language itself. *In re Burke Mountain, Inc.*, 64 B.R. 799, 802 (Bkrtcy. D.Vt.1986), *citing, Medor v. Lamb (In re Lamb)*, 47 B.R. 79 (Bkrtcy.D.Vt.1985). As a general rule, a statute should be read according to its literal terms, unless so reading renders the statute ineffective or leads to irrational consequences. *In re Burke Mountain Recreation, Inc.*, 64 B.R. 799, 802 (Bkrtcy.D.Vt.1986), *citing United States v. Locke*, 471 U.S. 84, 93, 105 S.Ct. 1785, 1792, 85 L.Ed.2d 64, 75 (1985) and *In re A.C.*, 144 Vt. 37, 470 A.2d 1191 (1984). The "plain meaning" of a statute controls; the statute should be enforced by courts in accordance with its express terms. *Id., citing, Heisse v. State*, 143 Vt. 87, 89, 460 A.2d 444, 445 (1983).

Section 2401(7), set out above, clearly describes a retail installment contract as a retail installment transaction, that involves a lien or security interest taken in the goods sold, and that is not a retail charge agreement or a document reflecting a sale under one.[6] 9 VSA § 2401(7). A retail charge

agreement, by contrast, is an agreement that is not a retail installment contract, and that involves deferred payments and charges computed in relation to a buyer's unpaid balance. 9 VSA § 2401(8). Beside the fact that retail installment contracts anomalously refer to "two or more installments over a period of time" and retail charge agreements refer to "one or more deferred installments," the two sections could be describing identical deferred payment contracts except for the mention of security in the retail installment contract definition.[7] Before even involving ourselves in pillars of statutory construction, common sense compels us to notice that security is part of the definition of one, but not of the other and that each definition excludes the other. If security were allowed in both types of arrangements, one of the definitions would be superfluous.

■ We reach the same conclusion when we utilize "statutory construction"—the more prestigious ilk of common sense. More difficult to pronounce than "common sense," but yet just as effective, is the maxim of statutory construction entitled *expressio unius est exclusio alterius*. This maxim states that the expression or the inclusion of one thing is the exclusion of others. *Burke Mountain, supra*, 64 B.R. at 802, *citing, Ford v. United States*, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927). The doctrine tells us, in other words, that we should lend credence to the absence of something when that thing is specifically included elsewhere because there is an inference that all omissions should be understood as exclusions. *See Sutherland Stat. Const.* § 47.23 (5th Ed.1992). In this case, it tells us that retailers under retail installment contracts are permitted to take liens, while retailers under retail charge agreements are not so permitted.

■ Sears has gone beyond the plain meaning of the words and has presented us

---

6. Note that this phrase indicates that if Sears is prohibited from taking security under a retail charge agreement and only may take security under a retail installment contract, then it may not take security in the individual transactions under its retail charge agreement.

7. The definition of "retail installment contract" also contains a description of applicable 'lease to own' type contracts which are unique to installment contracts involving security. These types of contracts are not relevant to open-ended retail charge agreements which do not mention security. Hence, they are contained in the former definition, not the latter.

with some plausible arguments as to why it should not be prohibited from taking security. Sears has failed, however, to explain why the legislature would create two substantively similar sections, one that contains provisions for lien-taking and one that does not, and each of which excludes the other, unless the reference to security means something. Sears cannot escape the oldest pillar of statutory construction, proclaimed by the Romans, that "[w]hat is not spoken is not willed and *vice versa*. Only that is will that is spoken." 2 Danz Geschichte des Romischen Rechts § 142.

■ To ensure that our reading of the "plain meaning" of the sections in question was not erroneously taken out of context, we must examine the statute in its entirety. *Burke Mountain, supra*, 64 B.R. at 802, *citing, Philbrook v. Glodgett*, 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975). We must not be guided by a single sentence, but must look to the provisions of the whole statute and to its object and policy. *Id.*

When looking beyond the definitions of retail installment contracts and retail charge agreements we quite clearly see the legislative intent in excluding security from charge agreements but allowing security in installment contracts. Section 2405, which prescribes the requirements for retail installment contracts, refers the reader to the interest ceiling as set forth in 9 VSA § 41a. Section 41a(b)(2) states: "for a retail installment contract the finance charge shall not exceed 18 percent per annum of the first $500.00 of the balance subject to finance charges and 15 percent per annum of the balance subject to finance charges in excess of $500.00." Retail charge agreements are governed by § 41a(b)(9) which states that finance charges under such agreements "shall be the rate or rates agreed upon by the parties but not to exceed twenty-one percent per annum."

■ Why would two substantively similar sections prescribe differing interest rates? A distinction based on security provides a plausible answer. The presence of security dictates the risk level of the transaction. Retail charge agreements are more at risk than their secured counterparts and therefore may charge more interest. This logical inference supports our previous reading of the statute. Although we need look no farther, we are persuaded by a discussion in the Vermont House Commerce Committee on February 3, 1987 between Karen Robinson of the Vermont Retailers Association and various representatives:

> MRS. ROBINSON: . . . The second is retail contract. That has a ceiling of 18 percent. That's the type of thing where you might buy furniture and pay it off over a certain number of months in equal installments.
>
> --------------: [8] You secured by the—
>
> MRS. ROBINSON: That's secured; that's the difference.
>
> --------------: By the furniture.
>
> MRS. ROBINSON: And that's why the interest is lower.
>
> --------------: Okay.
>
> --------------: Unsecured loans are 21 percent.
>
> MRS. ROBINSON: Right.

This discussion is not definitive of legislative intent because it was a mere conversation among representatives many years after VRISA's enactment. It does support, however, our recognition of the general understanding that unsecured loans are riskier investments that justify the imposition of higher interest rates.[9]

■ As a final step in statutory construction, we must ensure that our construction is consistent with the purpose of the statute as a whole and any other relevant language. Vermont's Retail Installment Sales Act is by nature a consumer protection

---

**8.** The individual names of the representatives involved in the conversation were apparently not caught by the reporter.

**9.** As another practical note, we question the integrity of Sears' holiday campaigns that encourage the use of the Searscharge for gift-giving.

Sears claims to have the right of repossession and places upon the cardholder the responsibility for loss or damage of the goods sold, but yet encourages customers to give away the security. See the Searscharge Agreement, paragraph 12.

statute. It sets out disclosures and interest rate ceilings with which retailers must comply. The disclosures ensure that the consumer is prepared for the undertaking of the debt in question and the interest-rate ceilings ensure that even the least prepared consumer will still be minimally protected from usurious interest charges. The chapter applies "exclusively to all retail installment transactions as defined in section 2401" of the statute. See 9 VSA § 2407, "Scope." Retail installment transactions, as defined in section 2401, "include every transaction wherein the promise or agreement to pay the deferred balance of the price is made by the retail buyer to the retail seller. . . ." 9 VSA § 2401(6). The section, then, was designed to protect every consumer who consents with a retailer to deferred payments of the purchase price over time.

 Sections 2405 and 2406 which prescribe the disclosures and rates required are very detailed sections of this broad-ranging statute. If retail creditors were able to take liberties beyond those permitted in these sections, the entire statute would be rendered ineffective. We must avoid any construction leading to such a result. For example, section 2405(f) requires creditors to place into the retail installment contract a description of the goods sold "which shall be sufficient for identification." This serves to protect both parties depending on the circumstance—imagine a circumstance where upon default Sears came to repossess just any old washing machine. Section 2406, regarding retail charge agreements, contains no such requirement. Creditors should not be able to avoid this regulatory provision by merely taking security under a retail charge agreement. In fact, were lien-taking permitted under retail charge agreements, creditors could simply avoid all of the requirements of a retail installment contract, including the interest ceiling, by calling the agreement a retail charge agreement.[10] This would be

quite simple given the similarity of the two types of arrangements that the sections could be describing.

 As a final note, in Sears' statutory construction argument, it contends that the right to take a security interest is a common law right, as in the right to take a chattel mortgage. Subjects such as chattel mortgages and conditional sales, however, are now covered by the UCC. See 9 VSA §§ 1691–1700 and §§ 1751–1797. "Repealed 1966 . . . now covered by § 9–102 et seq. of Title 9A [Vermont's UCC title]." While the UCC did not take away the right to enter into such transactions, it did place various limits upon the creditors, such as filing requirements. See 9A VSA § 9–302.[11] Most importantly, the UCC section covering the validity of security agreements in general provides that "[n]othing in this article validates any charge or practice illegal under any statute or regulation thereunder governing usury, small loans, *retail installment sales*, or the like. . . ." 9A VSA § 9–201, emphasis added. The mere existence of the UCC and VRISA qualifies the common law right to take a security interest. And, as noted previously, all purchases involving deferred payments to retailers are subject to VRISA. Therefore, any right that a retailer may have to take a security interest is not absolute and must comply with the UCC and/or VRISA. There need not be any specific language abrogating the right to take security because the right has already been qualified by the mere existence of these bodies of law.

### CONCLUSION

 As a matter of Vermont law, the Searscharge Agreement is a "retail charge agreement." Also according to VRISA, Sears is not permitted to take a security interest in goods sold under its retail charge agreements. Sears' lien against Oszajca is

---

**10.** Section 2405 also protects the creditor. An example is § 2405(m) which allows the holder of the security under a retail installment contract to collect delinquency charges, including expenses incurred by the creditor's attorney for "repossession or foreclosure . . . [and] storage charges." Section 2406 contains no such remedies. In this instance, calling a retail installment contract a

retail charge agreement would harm the creditor.

**11.** "A financing statement must be filed to perfect all security interests except the following: . . ." 9A VSA § 9–302(1).

void.[12] Accordingly, Sears' motion for summary judgment is denied and Oszajca's cross-motion is granted. Counsel for Oszajca should submit an order setting a status conference on the issue of whether Oszajca is entitled to damages[13]. A final order will be issued after determination of that issue.

We now turn to the Browns.

### THE BROWNS

#### FACTS

■ Prior to their bankruptcy filing, the Browns purchased from Sears various household items. Sears contends that the amount owed is $7,356.18 and that it retains a security interest in all of the items purchased under an agreement that grants Sears a security interest in each item purchased. According to Sears, the security interest in each item is retained until that item is paid off. Payments are first applied to finance charges, then to the first item purchased and finally to each successive item as the previous items are paid off. This payment method is commonly known as first-in-first-out or FIFO. Before February 5, 1994, the Browns had a balance due on one of their two accounts of $5,113.42. We do not know the number of purchases or the dollar amounts of any purchases that led up to this balance. Since that time, the Browns have made two fairly small purchases. At various times, the Browns have paid a total of $1,605.00 toward the account. Sears, which ordinarily uses the FIFO payment allocation method described above, argues that these payments have not been sufficient to release any of its liens.

■ Sears moved to compel the Browns to file a statement of intention[14] about how they propose to handle Sears' collateral under 11 USC § 521(2).[15] The Browns have responded by contending that Sears is not secured. They assert that they never signed a Searscharge Agreement, or any other type of security agreement, and Sears has not yet produced one.

■ Without such an agreement, we find that Sears cannot demonstrate the extent of any purchase money security interests it may have.[16] While charge slips, which purport to incorporate the Searscharge security agreement, may be sufficient to grant an ordinary security interest because they contain a description of the collateral and a debtor signature, they are not sufficient to prove the extent of a purchase money security interest. *See* 9A VSA § 9–203. As explained in the discussion below, the Sears charge slips cannot represent purchase money security interests because they do not provide a method of allocating payments. Sears must prove the purchase money character of its purported security interests to secure its position as a lienholder. The charge slips do not accomplish this. They only serve to remind the customers that they are consenting to a lien under the terms of their Searscharge Agreement.

#### DISCUSSION

■ UCC financing statements are usually required to perfect a lien. UCC 9–

---

**12.** Footnote 6, *supra*, and the Brown memorandum, *infra*, explain why Sears' individual sales slips are also insufficient to create a lien in its favor.

**13.** Oszajca claims damages under section 2409 which covers violations of VRISA. It states in pertinent part: "(a) In case of failure of any person to comply with any of the provisions of this chapter, such person ... is barred from recovery of any finance charge or of any delinquency ... and the buyer shall have the right to recover from such person an amount equal to any of such charges paid by the buyer with interest thereon from the time of payment and all expenses of collection including a reasonable attorney's fee, in a civil action on this statute." 9 VSA § 2409(a).

**14.** A statement of intention is mere notice. If Sears believes that it is secured, it should move for relief from stay under 11 USC 362(d).

**15.** 11 USC § 521(2) provides in pertinent part that a "debtor shall" ... "(2) if an individual debtor's schedule of assets and liabilities includes consumer debts which are *secured by property of the estate*—(A) within thirty days after the date of filing ... file with the clerk a statement of his intention with respect to the retention or surrender of such property ...".

**16.** And, if there were an agreement similar to the Oszajca agreement, a retail charge agreement, Sears would nevertheless be prohibited from taking a lien because of our holding in the Oszajca memorandum, *supra*.

302, 9A VSA § 9–302(1).[17] An exception exists for purchase money security interests in consumer goods. 9A VSA § 9–302(1)(d) [18]. The Sears liens, then, are valid only to the extent that they are purchase money security interests because there is no evidence that Sears has filed financing statements. Purchase money liens, however, can sometimes lose their purchase money status when the goods purchased are securing more than their individual costs.[19] The general rule is that individual items cannot secure a consolidated debt without a contractual or statutory mechanism that provides how items are to be paid off and to which items a purchase money security interest still applies. *See Breakiron v. Montgomery Ward,* 32 B.R. 400, 402 (Bkrtcy.W.D.Pa.1983) (purchase money nature is valid when collateral secures only the price and a method is provided to determine when items are paid in full); *In re Manuel,* 507 F.2d 990, 993 (5th Cir.1975) (security not purchase money where agreement failed to indicate the order in which purchases were paid off); *In re Nedeau,* 24 B.R. 1, 3 (Bkrtcy. S.D.Fla.1982), (charge slips referring to non-descriptive Searscharge security agreement do not show necessary assent to all terms to create lien).

The above cases do not dictate that Sears' liens should generally be held invalid. However, almost all of the cases that found purchase money security interests such as the one held by Sears to be valid involved, if not required, some sort of underlying statute or language in the security agreement that dictated a method for allocating payments. *See In re McCall,* 62 B.R. 57, 60 (Bkrtcy. M.D.Ala.1985) (combination of security agreement and state statute controlling); *Matter of Wiegert,* 145 B.R. 621, 623–24 (Bkrtcy.D.Neb.1991) (Searscharge security agreement); *In re Ganders,* 176 B.R. 581,

583–84 (Bkrtcy.N.D.Okl.1995) (statute). This court has found only two cases holding that Sears charge slips alone constitute valid security agreements. *In re Hardage,* 99 B.R. 738, 742 (Bkrtcy.N.D.Tx.1989) (sales slips retained a security interest in items purchased because this was the intent of the parties); *In re Hance,* 181 B.R. 184, 186 (Bkrtcy. M.D.Pa.1993) ("the language contained on the sales check is sufficient to demonstrate the parties' intention to grant a security interest"). Insofar as they rely on intent to create a security interest without mentioning the purchase money and allocation of payments aspects discussed above, we find them unpersuasive.

The Brown account described above well illuminates the problem of finding a purchase money security interest valid with only charge slips before us and without an agreement containing a method for allocating payments. We are simply unable to determine the extent of any potential Sears' liens because we do not know if the $1,605.00 in fact did release a lien by paying off an individual balance. If Sears contends that the collateral first purchased, which may be worth less than the amount paid, still secures the overall debt, the security interest would not be a purchase money security interest. The Sears lien, then, would not be valid because Sears did not file a financing statement.

The problem herein is not merely numerical. Even if we knew the nature of the purchases leading up to the balance due, we could not impose upon the Browns Sears' FIFO method of applying payments or a different method to determine the extent of any purchase money security interest.[20] First, the Browns have not assented by contract to have their payments applied in such a manner. The UCC may have allowed creditors like Sears to avoid the filing of financing

---

**17.** 9A VSA § 9–302(1) states that "A financing statement must be filed to perfect all security interests except the following . . .".

**18.** Section 9–302(1)(d) excepts "a purchase money security interest in consumer goods" from the filing requirement of § 9–302(1).

**19.** A purchase money security interest is by definition one taken by the seller of the collateral to secure all or part of its price. 9A VSA § 9–107.

**20.** The second most common method for applying payments is a "pro rata" method where payments are applied to each item according to the proportion of the entire balance that they represent. The lienholder, then, will retain a blanket lien over all purchases until the balance is paid in full. *See, e.g.,* 9 VSA § 2405(h)(2).

statements in consumer transactions, but it did not in doing so allow such creditors to ignore ordinary requirements of contract law, such as assent to terms. See *Nedeau, supra,* 24 B.R. at 3. Second, there are no statutory mechanisms prescribed that would allow us to impose a method of allocation when one is absent. While the section governing "retail installment contracts," 9 VSA § 2405, provides a statutory method of allocating payments for such contracts, "retail charge agreements" have no such statutory prescriptions.[21] Therefore, we cannot impose .a statutory payment schedule upon Sears.

## CONCLUSION

Without an agreement between the Browns and Sears delineating a payment method, Sears cannot prove the existence or extent of any purchase money security interest. For the charge slips themselves to constitute a security agreement, a UCC financing statement would have had to have been filed by Sears. Its motion to compel the Browns to file a statement of intention, therefore, is denied because Sears is an unsecured creditor. This denial is without prejudice.

Finally, we turn to the Perry case.

### *PERRY*

Sears filed a proof of claim in the Perry case for $1,725.77, secured, and $4,803.71, unsecured. Perry filed an objection to Sears' proof of claim contending that Sears, at a hearing, could not prove the existence of a valid lien and that Sears could not demonstrate how Perry's payments were allocated between secured and unsecured debt. When the hearing was called, Perry proposed that the case should be resolved according to our Oszajca decision and Sears did not object.

Given the stage of the Perry case, we are unable to rule on the claims objection. Sears has provided us with neither arguments nor papers, except the proof of claim, upon which to determine the validity of its claim. We believe that Sears was not given sufficient

opportunity to provide us with such information and therefore invite the parties in the Perry case to continue their claims objection hearings. Counsel for Perry should submit a proposed Notice of Hearing to the clerk's office for scheduling.

---

**21.** See discussion, Oszajca memorandum, *supra,* explaining why the Searscharge is a "retail charge agreement" not a "retail installment contract" and why no lien-taking is permitted under retail charge agreements.