207 B.R. 41 (1997)
In re Beverly OSZAJCA, Debtor.
SEARS, ROEBUCK & CO., Appellant,
v.
Beverly OSZAJCA, Appellee.
BAP No. 96-50006, Bankruptcy No. 95-10300 (FGC), Adv. No. 95-1079.
United States Bankruptcy Appellate Panel of the Second Circuit.
Argued and Submitted February 21, 1997.
Decided April 9, 1997.
Before: LIFLAND, GALLET and BUCKI, Bankruptcy Judges.

OPINION
LIFLAND, Chief Judge:
Sears, Roebuck & Co. ("Sears") appeals from an order of the bankruptcy court finding that, under Vermont law, the retention of a purchase money security interest in connection with a retail charge agreement is prohibited.

BACKGROUND
Prior to the filing of her bankruptcy petition, Beverly Oszajca (the "Debtor") entered into a SearsCharge Agreement (the "Agreement") with Sears[1]. The Agreement provides, inter alia, that Sears [retains] a security interest in items purchased on the SearsCharge account, with the security interest in each item released when the outstanding balance for that item is paid. In addition, the charge slip signed for each purchase made on the SearsCharge account contains provisions for the creation of a security interest in the goods purchased and provides that the additional purchase is made under the *43 provisions of the Agreement, which is incorporated by reference.
On June 10, 1994, the Debtor charged purchases in the amount of $2,001.25 on her SearsCharge account. The Debtor subsequently made payments on the account in the total amount of $42.00 through April 26, 1995, the date when she filed her Chapter 7 petition. Sears filed a proof of claim against the Debtor's estate in the amount of $2,268.38, of which $1,524.76 was purportedly secured by a purchase money security interest in the goods.
Sears filed a motion to compel the Debtor to file a statement of intention under sections 521(2)[2] and 722 of the Bankruptcy Code (the "Code") and Federal Rules of Bankruptcy Procedure 1007(b)(2) and 1009(b). The Bankruptcy Court denied the motion and, shortly thereafter, the Debtor commenced an adversary proceeding seeking a determination as to the validity, priority and extent of the lien claimed by Sears in the goods. The Debtor moved for summary judgment, arguing first that the Agreement constituted a retail installment contract rather than a retail charge agreement under the Vermont Retail Installment Sales Act, Vt.Stat.Ann. tit. 9, §§ 2401-2410 ("VRISA"). Alternatively, the Debtor argued that if the Agreement was determined to be a retail charge agreement then the lien was void because the VRISA prohibits the taking of security interests in connection with such agreements.
The bankruptcy court granted summary judgment in favor of the Debtor. Oszajca v. Sears, Roebuck & Co. (In re Oszajca), 199 B.R. 103 (Bankr.D.Vt.1996). First, the bankruptcy court held that the Agreement was a retail charge agreement, not a retail installment contract. This portion of the bankruptcy court's decision was not appealed and remains undisturbed.
Second, the bankruptcy court held that Sears is not entitled to take a security interest under the VRISA and, therefore, is unsecured. Accordingly, the sole issue before this court is whether, under Vermont law, a retail seller may retain a security interest in goods sold pursuant to a retail charge agreement as defined in the VRISA.

DISCUSSION
Where the issue on appeal is a question of law, the standard of review is de novo. General Motors Acceptance Corp. v. Valenti (In re Valenti), 105 F.3d 55, 59 (2d Cir.1997) (citing Bellamy v. Home Loan Mortgage Corp. (In re Bellamy), 962 F.2d 176, 178 (2d Cir.1992).

THE BANKRUPTCY COURT'S DECISION
The VRISA provides for two types of retail installment transactions  a retail installment contract and a retail charge agreement. The bankruptcy court noted that by definition a retail installment contract[3] contains a security agreement and a retail charge agreement[4] does not. Accordingly, the bankruptcy court found that, because of the maxim of expressio unis est excludio *44 alterius[5], a retail charge agreement cannot contain a security agreement. In re Oszajca, 199 B.R. at 107. The court further noted that this doctrine was especially plausible because the mention of security is one of the few stated differences between the two types of contracts. Id. at 108.
The bankruptcy court also found that the legislative intent to exclude security interests from retail charge agreements was apparent by looking at the ceilings prescribed for the different rates of finance charge allowable for each type of transaction. Under Vermont law, the finance charge for a retail installment contract is capped at 18% per annum while the finance charge for a retail charge agreement is capped at 21% per annum. Id. at 108; 9 Vt.Stat.Ann. tit 9, §§ 41a(a), 2405, 2406 (1995). The bankruptcy court believed that the difference in the prescribed rates was based on the presence of security in a retail installment contract and the lack of it in a retail charge agreement.
Lastly, the bankruptcy court found that the prohibition against the retention of security interests in connection with retail charge agreements was consistent with the purpose of the statute as a whole  consumer protection. 199 B.R. at 109.
RETAIL INSTALLMENT SALES LEGISLATION
Generally, the purpose of retail installment sales legislation is to protect retail buyers of goods from unknowingly assuming excessive charges by requiring that all charges and terms be set forth by a retail seller before a contract is signed by the buyer. See Keyes v. Brown, 155 Conn. 469, 232 A.2d 486 (1967). Virtually every state has adopted some form of consumer credit protection legislation. See Am Jur 2d, New Topic Service, Consumer & Borrower Protection, § 195 (1982) (hereinafter "Am Jur 2d"). As is true under the federal Truth in Lending Act,[6] state statutes affording consumer protection are directed to disclosure. Am Jur 2d at § 196. Generally, these statutes recognize the two types of retail credit transactions that are addressed in the VRISA.
In analyzing the VRISA, the bankruptcy court found that in defining the two types of transactions the sections could be describing identical deferred payment contracts except for the mention of security in the retail installment contract definition. Id. at 108. Accordingly, the court opined that if security were allowed in both types of arrangements, one of the definitions would be superfluous. We disagree. Rather,
[t]he main distinction between a retail installment contract and a revolving account [i.e., retail charge agreement] is that in a retail installment contract the purchase price of each purchase thereunder is to be payable in installments, from month to month or some other regular period, the time price differential being calculated at the time of purchase and the time of payment determined; while in a revolving account "the buyers total unpaid balance thereunder, whenever incurred is payable in installments over a period of time," upon which the time price differential "is to be computed with relation to the buyers unpaid balance from time to time," computed from month to month or some other regular period.
Op.Atty.Gen. of Florida, 061-23, Feb. 8, 1961. (regarding Florida's Retail Installment Sales statute, Fla.Stat.Ann. § 520.31 et seq.). See also Singer Co. v. Gardner, 65 N.J. 403, 323 A.2d 457 (1974) (stating that "the existence of a security interest is wholly immaterial to a classification of a credit plan as either an installment contract or a revolving charge account"); Brown v. Jenkins, 135 Ga.App. 694, 218 S.E.2d 690, 693 (1975) ("The major difference between the two types of accounts is in the method of calculating the credit charge. Whereas in a revolving account the finance charge is computed from time to time on the basis of the debtor's unpaid balance, in a retail installment sale, the credit charge is calculated in advance and added on to the cash sale price.").
*45 Consumer credit as we know it today had its origin in the sale of hard goods by local retailers. Brown v. Jenkins, 218 S.E.2d at 692. Traditionally, under a conditional or installment sale contract, a seller retained a security interest in the property because the usual sale was that of hard goods which would have some resale value after repossession. See W.T. Grant Co. v. C.I.R., 483 F.2d 1115, 1119 n. 6 (2d Cir.1973), cert. denied, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 288 (1974). In addition, in return for the credit extended, the seller added a finance charge, a "time-price differential," to his cash price. However, the increasing expansion of retail credit to mass sales of soft goods and consumables necessitated certain changes in the mechanics of credit sales. Clerical costs and convenience made it impractical to assign a time-price differential to each item bought and to enter into a separate contract providing for payment in installments of each time-price. Instead, it was more efficient and convenient simply to add the cash price of each purchase to a customer's account and apply some periodic credit charge to the total. See R.L. Jordan and W.D. Warren, Uniform Consumer Credit Code, 68 Colum.L.Rev. 387, 403 (1968). Thus, the revolving account emerged as a method of combining volume merchandising with credit sales. Brown v. Jenkins, 218 S.E.2d at 693. In many instances, items bought on a revolving credit plan were not subject to the seller's security interest because, more often than not, such items were soft goods which have relatively little resale value after repossession. See W.T. Grant Co. v. C.I.R., 483 F.2d at 1119 n. 6; J.G. Donaldson, An Analysis of Retail Installment Sales Legislation, 19 Rocky Mountain Law R. 135, 140 n. 9-11 (1947) (noting that, in connection with certain time transactions, security is impractical because of the perishable nature of the goods, nominal resale value, small monetary sums, involved or frequency of purchase. Such transactions involve "soft goods" such as clothing, linens and the bulk of goods handled by department stores). However, "this does not mean that a seller cannot and should not be allowed to retain a security interest in any item that he sells when both buyer and seller agree to create such an interest." Brown v. Jenkins, 218 S.E.2d at 693.
The VRISA is a disclosure statute. It does not directly authorize or prohibit security interests in consumer goods purchased under a retail charge agreement. Similarly, many retail installment sales acts ("RISAs") in other states do not specifically refer to the retention of security interests in connection with retail charge accounts. See Ky.Rev.Stat.Ann. § 371.210(8) (Banks-Baldwin 1997); Tenn.Code Ann. § 47-11-102 (1996); Fla.Stat.Ann. §§ 520.31, 520.34 (West 1996); Mo.Ann.Stat. § 408.250 (West 1997); N.J.Stat.Ann. § 17:16C-1 (West 1995); Neb. Rev.Stat. § 45-204 (1995); Md.Code Ann. Comm.Law § 12-501 (Michie 1996). Several other state RISAs merely include in the definition of a retail charge agreement, a phrase such as "whether secured or unsecured." See 815 Ill.Comp.Stat. 405/2.7 (West 1996) (Retail charge agreement "whether secured or unsecured"); Cal.Ann.Civ.Code § 1802.7 (West 1997) (Revolving account  "whether or not secured"); Mich.Comp.Laws Ann. § 445.862(h) (West 1996) (Retail charge agreement [includes] a "secured or unsecured retail installment transaction"); Nev. Rev.Stat. § 97.095 (1995) (Retail charge agreement "whether or not a security interest . . . is retained by the retailer"); 69 Pa. Stat.Ann. § 1201(7) (West 1997) (Revolving account  "whether or not a security interest in the goods sold is retained by the seller."); Tex.Civ.Code Ann. § 5069-6.01(g) (same); Mass.Gen.Laws Ann. Ch. 255D § 1 (West 1996) (definition of revolving credit agreement does not mention security interest but definition of "security interest" includes a property right retained under a revolving credit agreement).
Generally, in states where the RISA statute does not refer to a security interest, courts look to the provisions of the Uniform Commercial Code (the "UCC"), as adopted by the specific state, to determine if the seller has a valid security interest in consumer goods. See In re Wiegert, 145 B.R. 621 (Bankr.D.Neb.1991); In re Ziluck, 139 B.R. 44 (S.D.Fla.1992); In re Campbell, 129 B.R. 1020 (Bankr.S.D.Ala.1991); In re Moody, 62 B.R. 282 (Bankr.D.Miss.1986); In re Orecchio, *46 54 B.R. 685 (Bankr.D.N.J.1985); In re Nedeau, 24 B.R. 1 (Bankr.S.D.Fla.1982); In re Anderson, 23 B.R. 130 (Bankr.D.Neb. 1982); Sears, Roebuck & Co. v. Silch, 899 S.W.2d 153 (Mo.Ct.App.1995). While a court may look to the local RISA to determine whether a "valid retail charge account existed and was utilized in accordance with the local law," the validity of the security interest in connection with such account is determined by looking to the provisions of the local UCC statute. In re Orecchio, 54 B.R. at 687. See also Brown v. Jenkins, 218 S.E.2d at 692 (stating that "the UCC governs the creation and incidents of security interests whereas the [RISA] prescribes the mechanics of financing consumer transactions").
In only two instances of which we are aware, is the retention of a security interest in connection with a retail charge agreement specifically prohibited within the provisions of a RISA statute. But where that is the case, the state legislature has clearly stated so. See N.Y.Pers.Prop.Law § 413(12) (McKinney 1996) ("No retail instalment credit agreement, or any agreement executed in connection therewith, may provide for the creation of a security interest in any personal or real property (including any goods sold under such agreement) to secure payment of the buyer's outstanding indebtedness under such retail instalment credit agreement."); Ga.Code Ann. § 10-1-8 (1996) (Providing that "[a] security interest taken pursuant to a retail installment contract or revolving account shall not be taken with respect to clothing, softwares, and other nondurable items."). However, "unless specifically restricted, a security interest may be created by the contractual agreement of two parties to secure the payment of an obligation by creating rights in one party as to certain designated collateral." Brown v. Jenkins, 218 S.E.2d at 692. Lacking a specific prohibition, courts have found that
[t]he [RISA] statute has nothing to do with the creation, duration, definition, or enforcement of purchase money security interests in consumer goods, and, specifically, does not purport to terminate a security interest contrary to the clear terms of a security agreement.
W.S. Badcock Corp. v. Banks (In re Norrell), 426 F.Supp. 435, 436 (M.D.Ga.1977). See also Lee v. Davis/McGraw, Inc. (In re Lee), 169 B.R. 790, 794 (Bankr.S.D.Ga.1994).
Because the VRISA does not specifically prohibit the retention of a security interest in connection with a retail charge agreement, we believe that whether Sears has a valid purchase money security interest is properly determined by looking to the provisions of Vermont's UCC statute not the VRISA.
While the bankruptcy court cited to statements made during a discussion in the Vermont House Commerce Committee some twenty odd years after the enactment of the VRISA, they shed no light on the legislature's intent at the time of enactment. The handwritten records of the legislature during the passage of the VRISA are similarly unrevealing on the issue before us.
The Debtor argues that the use of terms within the VRISA which relate to the perfection of a security interest and apply only to retail installment contracts (except for the definition of recording fee which is used nowhere else in the statute and was apparently left in the statute because of a drafting oversight), is evidence that the legislature intended to prohibit security interests in connection with retail charge agreements. We disagree and find no evidence of an overt legislative intent to prohibit such interest. We do, however, note that under the UCC exception to perfection of security interests, a purchase money security interest in consumer goods need not be recorded (provided it complies in all other respects with the UCC, including the allocation of payment scheme) and thus, does not require recording.[7] In addition, pre-UCC law "granted sellers of consumer goods and those who lent the purchase price of such goods perfected *47 status even without filing." J. White & R. Summers, Handbook of the Law Under the Uniform Commercial code 920 (2d ed. 1980). A simpler explanation for the lack of provisions  such as official fees and other indicia of security interests which, under the VRISA, must be set forth only in connection with a retail installment contract  is the fundamental difference between the transactions, that is open-end versus closed-end credit. Under the closed-end arrangement, a contract is executed at the time a purchase is made, providing for the addition of a pre-computed finance charge and all other charges to the unpaid amount of the cash price, and for payment of the resulting balance in a fixed number of prorated installments. All charges are calculated at the time of purchase in order to allow the consumer to understand what his purchase will cost him in the end. One of the underlying purposes behind this genre of disclosure statute is to allow the consumer to shop and compare and obtain the best deal. As noted by the bankruptcy court, an open-end credit arrangement such as the SearsCharge account cannot comply with these disclosure requirements because it allows a customer to pay anywhere between the full balance due and 1/48th of the balance each month. 199 B.R. at 107. Under the open-end credit arrangement, the time and amount of payment are within the exclusive control of the consumer; she alone determines the precise rate. Accordingly, the total cost of the goods purchased under a retail charge agreement including finance charges, unlike the retail installment contract, cannot be calculated at the time of purchase.
Bankruptcy Court's Risk Analysis
The bankruptcy court also determined that a plausible reason for prescribing different interest rates for the two transactions was because retail charge agreements are more at risk than their secured counterparts and, thus, the higher risk supports authorization for higher rates. 199 B.R. at 108. While it is true that the Vermont legislature found the two transactions different and assigned them different maximum interest rates, neither VRISA nor the legislative history explain why. Although the bankruptcy court speculated that the reason was more or less risk to the merchant, there is no independent support for that position. We do know that subsequent to the enactment of VRISA, the legislature enacted the UCC, which appears to permit security interests in consumer goods purchased under retail charge agreements. If the legislature intended to exclude retail charge agreements, there is no evidence of it. Nor has it acted to remedy the situation over the last thirty years.
Moreover, the different interest rate ceilings are not determinative of the rights which should be afforded the creditors in each type of transaction. Brown v. Jenkins, 218 S.E.2d at 693. Although the finance charges for retail installment contracts and retail charge agreements in Vermont are capped respectively at 18% and 21% per annum, the retail installment contract uses an add-on rate while the retail charge account uses a rate computed upon a declining balance. Thus, in real dollar terms, the revolving account may at times involve a smaller finance charge. The cost in dollars of the credit extended under a revolving account will vary according to the amount of payments made by the buyer. While one rate may be higher than another, this does not necessarily reflect a higher finance charge in dollar-terms. Id. See also, Retail Installment Sales Legislation, 58 Col.L.Rev. 854, 873-74 (1958). We are further convinced of the irrelevance of the statutory interest rate structure by looking to other RISA statutes. In particular, RISA statutes that specifically recognize the availability of a security interest in connection with both types of transactions, provide different rates of interest that may be charged under a retail charge agreement and a retail installment contract. See e.g., Mass.Gen.L.Ann. 255D §§ 11, 27 B(1) (West 1996) (18% on revolving charge accounts, whether secured or unsecured; 21% on installment contracts).
CONCLUSION
In view of the foregoing, we find that the VRISA does not prohibit the retention of a security interest in connection with a retail charge agreement. Whether Sears has a valid purchase money security interest is to be determined instead by looking to the provisions *48 of the Vermont UCC. As conceded by the parties at the hearing, the issue of whether Sears holds a valid purchase money security interest under the provisions of the Vermont UCC, was not addressed by the bankruptcy court, is not before us and, therefore, is one we do not decide today.[8]
The order of the bankruptcy court is REVERSED.
GALLET and BUCKI, JJ., concur.
NOTES
[1] Although neither the original Agreement signed by the Debtor nor any copy thereof was introduced in the court below, the parties stipulated that the Debtor signed a charge agreement containing the same terms as a sample submitted by Sears.
[2] Section 521(2) provides, in part, that a debtor, with consumer debts which are secured by property of the estate, shall file a statement of his intention with respect to the retention or surrender of such property and, within a prescribed period thereafter, perform his intention. 11 U.S.C. § 521(2)(A), (C).
[3] A "retail installment contract" is defined, in relevant part, as a contract designated as a retail installment transaction, but not a retail charge agreement, evidencing an agreement to pay the retail purchase price of goods, or any part thereof, in two or more installments over a period of time, and pursuant to which title to, or a lien upon, or a security interest in, the goods is retained or taken by the retail seller to secure the payment of a price which includes the charge as limited by section 2405 of this title. The term includes but is not limited to, a chattel mortgage, a conditional sales contract and a contract in the form of a bailment or lease. Vt.Stat.Ann. tit. 9, § 2401(7).
[4] "Retail charge agreement" means an agreement other than a retail installment contract, which prescribed the terms of retail installment transactions which may be made thereafter from time to time under it, under which the buyer's total unpaid balance thereunder, whenever incurred, is payable in one or more deferred installments and under the terms of which the retail buyer pays a price which includes a charge as limited by section 2406 of this title, which charge is to be computed in relation to the buyer's unpaid balance from time to time. Vt.Stat. Ann. tit. 9, § 2401(8).
[5] Expressio unis est excludio alterius is a maxim of statutory interpretation meaning that the expression of one thing is the exclusion of another. Black's Law Dictionary, (6th ed. 1991).
[6] 15 U.S.C. §§ 1601-1693r (1994).
[7] See Vt.Stat.Ann. tit. 9A § 9-302(1)(d). A purchase money security interest taken in connection with a retail installment contract, however, may not fit within this exception because of the allocation of payment scheme required for such transactions under the VRISA. See Vt.Stat.Ann. tit. 9 § 2405(h). See also In re Ganders, 176 B.R. 581 (Bankr.N.D.Okla.1995) (explaining allocation of payments scheme).
[8] This issue was neither briefed by the parties nor considered by the bankruptcy court.